STATE OF CONNECTICUT *v.* VEASNA TOK
(AC 27315)

STATE OF CONNECTICUT *v.* EDDY JOURDAIN
(AC 27316)

McLachlan, Harper and Pellegrino, Js.

Argued October 24, 2007—officially released April 29, 2008

*Pamela S. Nagy*, special public defender, for the appellant (defendant in the first case).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *David R. Shannon*, assistant state's attorney, for the appellee (state in the first case).

*Christopher M. Neary*, special public defender, for the appellant (defendant in the second case).

*Rita M. Shair*, senior assistant state's attorney, with whom were *Walter D. Flanagan*, former state's attorney, and, on the brief, *David R. Shannon*, assistant state's attorney, for the appellee (state in the second case).

*Opinion*

PELLEGRINO, J. The defendants, Veasna Tok and Eddy Jourdain, each were convicted after a consolidated trial before a jury following their arrests for involvement in an assault occurring outside a Danbury nightclub.[1] On appeal, Tok claims that (1) the trial court abused its discretion in permitting Johnny Vega to testify through an interpreter, (2) his constitutional rights were violated because the interpreter provided unreliable interpretations, (3) the prosecutor engaged in impropriety during the questioning of witnesses and closing and rebuttal arguments, (4) the court improperly instructed the jury on the essential element of

---

[1] Tok appeals from the judgment of conviction of (1) two counts of assault in the first degree in violation of General Statutes § 53a-59, (2) attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-59, (3) conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 and 53a-59, and (4) assault in the first degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-59.

Jourdain appeals from the judgment of conviction of (1) two counts of assault in the first degree in violation of § 53a-59, (2) attempt to commit assault in the first degree in violation of §§ 53a-49 and 53a-59, (3) conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-59, (4) assault in the first degree as an accessory in violation of §§ 53a-8 and 53a-59, and (5) possession of marijuana in violation of General Statutes § 21a-279 (c).

intent, (5) the court improperly charged the jurors on both subdivisions of the attempt statute and (6) the court failed to give the jury a specific unanimity instruction as to the theory of liability. On appeal, Jourdain claims that (1) the court abused its discretion in permitting Vega to testify through an interpreter, (2) during the course of Vega's testimony, Jourdain's constitutional rights were violated because the interpreter provided unreliable interpretations, (3) the prosecutor engaged in impropriety during closing and rebuttal arguments, (4) the court improperly instructed the jury on the essential element of intent and (5) the court improperly referred to the defendants in the singular when giving its charge.[2] We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. At approximately 11 p.m. on August 27, 2004, the

[2] Jourdain raises two additional claims that have no merit and can be disposed of with little discussion. First, he claims that the court improperly admitted a printout of a page from an Internet site that was used by the prosecutor to impeach a defense witness. Jourdain did not object to this evidence at trial and cannot raise this claim on appeal. See, e.g., *State* v. *Gould*, 241 Conn. 1, 9 n.3, 695 A.2d 1022 (1997) (noting that "[w]hen a defendant does not join a codefendant's motion for tactical or other reasons, the defendant cannot [challenge the alleged impropriety] on appeal"). Even if Jourdain could now raise this unpreserved evidentiary claim by virtue of his codefendant's objection, the court did not abuse its discretion in admitting the evidence. See *Smith* v. *Greenwich*, 278 Conn. 428, 446–47, 899 A.2d 563 (2006).

Jourdain also claims that the initial stop and seizure of him was illegal under the principles set forth in *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), thereby requiring suppression of the marijuana found on his person. Although counsel for Jourdain filed a written motion to suppress the evidence, the court did not rule on the motion. This case must be decided on the record; see *State* v. *Gilnite*, 202 Conn. 369, 379, 521 A.2d 547 (1987); and the record presented is devoid of a ruling on Jourdain's motion to suppress. This court cannot review a nonexistent ruling. See *Augeri* v. *Planning & Zoning Commission*, 24 Conn. App. 172, 179, 586 A.2d 635, cert. denied, 218 Conn. 904, 588 A.2d 1381 (1991). Jourdain also asserts that his claim is reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). This claim, however, fails under *Golding*'s first prong because an examination of the record leads us to conclude that it is inadequate for review. See *State* v. *Farr*, 98 Conn. App. 93, 101, 908 A.2d 556 (2006).

victim, Jason Sheppard, went to Tuxedo Junction, a Danbury nightclub. While at the nightclub, Sheppard met an acquaintance, Jessica Osorio, and arranged for her to drive him home. At approximately 1:45 a.m., Sheppard and Osorio left the nightclub and walked through an alley to where Osorio's car was parked. While they were walking, Osorio heard footsteps approaching from behind. Sheppard turned around and saw three men, whom he recognized as Tok, Tok's younger brother and Jourdain. Jourdain, acting first, punched Sheppard above his eye. Thereafter, the three assailants, acting together, assaulted Sheppard continually. At some point, a metal pipe was used to strike Sheppard on the head.

A few minutes after the assault began, the assailants fled. Sheppard suffered a split lip, swollen eye, bruising on both eyes, lumps on the back of his head, a bruise on his neck and cuts on his head, elbows and knees. When the police arrived, Sheppard identified the defendants and Tok's brother as his assailants. Sheppard then was taken by ambulance to a hospital to receive treatment for his injuries.

During their investigation immediately following the assault, the police encountered Vega, a deaf mute who, through hand gestures, alerted police that he had seen the assault. Vega then pointed to a group of seven males getting into a car together. Officers approached the males and instructed them to stop. The police then conducted a lineup at the scene. Vega identified the defendants and Tok's brother as the assailants. The police thereafter arrested the defendants. Additional facts will be set forth as necessary.

I

## JOINT CLAIM ARISING FROM THE TESTIMONY OF VEGA

The defendants each claim that the court improperly permitted Vega to testify at trial through a certified sign

interpreter. The defendants' claim is twofold. First, they claim that the court abused its discretion in permitting Vega to testify through an interpreter. Second, they claim that during the course of Vega's testimony, their constitutional rights were violated because the interpreter provided unreliable interpretations. We are not persuaded.

Additional facts are necessary to resolve the defendants' claims. Before Vega testified at trial, the court held a hearing to determine if he was able to communicate through the use of an interpreter. Deborah Greener and Pasquale Leo, both certified interpreters in American sign language, testified that they met with Vega outside of the courtroom and were able to communicate with him using sign language.[3] They also testified that there were some minor communication glitches during their meeting but that communication was possible through repetition and rephrasing of unknown signs. Upon inquiry from the court, the interpreters stated that they felt comfortable interpreting the language of Vega. At this juncture, Tok's attorney objected to permitting Vega to testify without assurances that the interpreters were able to provide a word for word translation. The court overruled the objection and permitted Vega to testify through an interpreter. During Vega's testimony, Greener indicated on at least three separate occasions that she needed to reinterpret something or there had been a misinterpretation. Neither of the defendants objected to the quality of interpretation during Vega's testimony.

A

Vega's Competency to Testify

The first component of the defendants' claim is that the court abused its discretion in permitting Vega to

---

[3] Greener was to act as the lead interpreter, and Leo was present as a backup.

testify. The defendants' claim challenges whether Vega was competent to be a witness due to his inability to speak. Although there is a presumption that every person is competent to be a witness; Conn. Code Evid. § 6-1; "[a] person may not testify if the court finds the person incapable of . . . expressing himself or herself concerning the matter so as to be understood by the trier of fact either directly or through interpretation by one who can understand the person." Conn. Code Evid. § 6-3 (b). Our key inquiry, therefore, is whether Vega could express himself "either directly or through interpretation by one who can understand" him.

Because the defendants' claim challenges an evidentiary ruling, our review of the court's decision is limited to whether the court abused its discretion. See *Hayes* v. *Decker*, 263 Conn. 677, 683, 822 A.2d 228 (2003); *State* v. *Rodriguez*, 180 Conn. 382, 389, 429 A.2d 919 (1980). On the basis of the record before us, we are confident that the court did not abuse its discretion in permitting Vega to testify.

A court has wide discretion to permit "any method of interrogation that is best adapted to obtain information intelligibly." C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 6.3.5, p. 299. In the present case, Vega's inability to speak required the court to permit the use of an alternative method of interrogation. The court could have permitted Vega to be examined through written questions or, as the court ultimately chose to do, through sign language. In either case, our code of evidence requires that the court be satisfied that Vega could express himself to the trier of fact. The court's colloquy with the interpreters, whereby the interpreters stated that they were able to communicate effectively with Vega, is sufficient to satisfy the competency requirements set forth in our code of evidence.[4]

---

[4] Tok also claims that the court did not ascertain if the interpreters satisfied the requirements of General Statutes § 46a-33a (e), which sets forth the certification requirements of interpreters interpreting in a legal setting. The

The defendants argue that the interpreters were required to guarantee that Vega could understand them with 100 percent accuracy and that they could likewise understand him to such a certainty. We find, however, no Connecticut precedent for this proposition, and the defendants likewise cite to none. More importantly, the record does not support the defendants' contention that the interpreters were unable to understand Vega. We believe, in fact, that the record belies such a claim because the interpreters testified that they were able to communicate with Vega, and Vega did in fact testify through an interpreter in a manner that does not suggest any misunderstanding in communication. Although there were "communication glitches" where the interpreter stated that she misinterpreted a question or response or needed clarification as to the question or as to Vega's response, these instances are not evidence of the interpreters' lack of understanding of Vega such that Vega was rendered incompetent to testify. Accordingly, the court did not abuse its discretion in permitting Vega to testify through an interpreter.

B

Interpretation of Vega's Testimony

The second component of the defendants' claim is that during the course of Vega's testimony, their rights under the fifth, sixth and fourteenth amendments to the United States constitution and under article first, § 8, of the constitution of Connecticut were violated because the interpreter provided unreliable interpretations. The defendants refer to the communication

defendant failed to raise this claim at trial. "It is well settled that this court will not review statutory claims that are raised for the first time on appeal. . . . Furthermore, statutory, nonconstitutional claims are not reviewable under [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)]." *State* v. *Smith*, 255 Conn. 830, 843, 769 A.2d 698 (2001).

glitches referenced in part I A as evidence of the unreliable interpretations, which thereby violated the defendants' fifth amendment due process rights and sixth amendment rights to be confronted by the witnesses against them.[5] We are not persuaded.

We begin our analysis by finding that this portion of the defendants' claim was not preserved at trial. During the course of Vega's testimony, the defendants did not object to the manner in which the interpreter communicated the testimony. The only objections the defendants made in relation to the use of interpreters came prior to Vega's testimony and concerned the preliminary question of whether the interpreters could understand Vega. These pretestimony objections properly are viewed as challenging Vega's competency, and, as discussed in part I A, the court did not abuse its discretion in overruling them. The present claim, however, is that during the course of Vega's testimony, the interpreter failed to communicate Vega's testimony to the jury, and, as such, the defendants' constitutional rights were violated. Accordingly, if the defendants believed that the interpreter was providing erroneous interpretative services subsequent to the court's determination that Vega was competent to testify, the defendants were required to object so that the court could rule on the merits of the objection. The defendants failed to do so. We conclude that the defendants' claim was not preserved at trial.[6]

---

[5] The defendants have analyzed this claim exclusively under the federal constitution. The appellate courts of this state consistently have declined to review state constitutional claims when such claims are unaccompanied by a separate and sufficient analysis pursuant to *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992). See, e.g., *State* v. *Colon*, 272 Conn. 106, 154 n.26, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); *State* v. *Lindo*, 75 Conn. App. 408, 410 n.2, 816 A.2d 641, cert. denied, 263 Conn. 917, 821 A.2d 771 (2003). Accordingly, our review is limited to the federal constitution.

[6] Tok also seeks plain error review of this claim. "[T]he plain error doctrine, which is now codified at Practice Book § 60-5 . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this

It is well settled that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see also *State* v. *Woods*, 250 Conn. 807, 815, 740 A.2d 371 (1999). Although the record is adequate for review and the claim is of constitutional magnitude,[7] the defendants' claim fails to satisfy *Golding*'s third prong because the defendants were not deprived of a fair trial.

court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 86–87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007). Because Tok's claim does not present the type of extraordinary situation that warrants plain error review, we decline to review it according to this standard.

[7] The requirement that an interpreter provide an accurate translation implicates a defendant's due process right to a fair trial as guaranteed by the fifth amendment. See *State* v. *Sinvil*, 90 Conn. App. 226, 230–38, 876 A.2d 1237, cert. denied, 275 Conn. 924, 883 A.2d 1251 (2005); *United States* v. *Huang*, 960 F.2d 1128, 1136 (2d Cir. 1992) ("the ultimate question is whether the translator's performance has rendered the trial unfair"); see also *United States* v. *Gomez*, 908 F.2d 809, 811 (11th Cir. 1990) (word for word translation of witness' testimony best ensures that "the quality of the translation does not fall below [a] constitutionally permissible threshold" [internal quotation marks omitted]); *United States* v. *Cirrincione*, 780 F.2d 620, 634 (7th Cir. 1985) ("a defendant in a criminal proceeding is denied due process when: (1) what is told him is incomprehensible; (2) the accuracy and scope of a translation at a hearing or trial is subject to grave doubt; (3) the nature of the proceeding is not explained to him in a manner designed to insure his full comprehension; or (4) a credible claim of incapacity to understand due

The record does not disclose that anything the interpreter did in interpreting the testimony of Vega deprived the defendants of a fair trial. The record discloses the level of care the interpreter utilized in the discharge of her duties and further discloses that in those instances when she had a communications problem with Vega, she stated to the court that there was a miscommunication or that she needed to reinterpret a sign. There is no indication, however, that at such junctures communication with Vega became altogether impossible. In fact, the interpreter's recognition of those instances when there was a misunderstanding is evidence of the interpreter's competence. By working to find a solution through re-signing the question or seeking clarification from Vega, the interpreter was able to continue communicating with Vega. There is simply nothing in the record that permits an inference that the interpreter and Vega were unable to communicate effectively. Therefore, the defendants' claim fails under the third prong of *Golding*.

## II

### PROSECUTORIAL IMPROPRIETY

The defendants' second joint claim is that they were deprived of a fair trial because the prosecutor engaged

to language difficulty is made and the district court fails to review the evidence and make appropriate findings of fact").

Tok asserts that this claim implicates his "constitutional rights" by violating his rights to due process and confrontation. He does not indicate which provision of the federal constitution his claim arises under. Accordingly, we analyze his claim under the fifth amendment.

Jourdain asserts that this claim arises under the fifth and sixth amendments. Although we agree with Jourdain that in some instances an inadequate interpretation may implicate a defendant's right to confrontation; see *United States ex rel. Negron* v. *New York*, 434 F.2d 386, 389–90 (2d Cir. 1970) (absent adequate interpretation, defendant prevented from understanding testimony offered against him and lacked ability to confront witnesses); we do not agree that this is such an instance. Contrary to the defendant in *United States ex rel. Negron*, Jourdain was fully aware of the testimony that was being offered against him. His claim properly is viewed as attacking the fundamental fairness of the trial. Accordingly, we analyze it under the fifth amendment.

in several instances of impropriety. The defendants both claim that several remarks made by the prosecutor during closing and rebuttal arguments constituted impropriety. Additionally, Tok claims that the prosecutor engaged in impropriety by suggesting that a witness was lying and insinuating that Tok was a gang member. We are not persuaded.

The defendants concede that they did not object at trial to any of the alleged improprieties and seek review of their claims pursuant to *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004). In *Stevenson*, our Supreme Court held that after a determination that prosecutorial impropriety has occurred, regardless of whether it was objected to, an appellate court must apply to the entire trial the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). See *State* v. *Stevenson*, supra, 573. Our preliminary task, therefore, is to determine whether prosecutorial impropriety had occurred.

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *Serrano*, 91 Conn. App. 227, 231, 880 A.2d 183, cert. denied, 276 Conn. 908, 884 A.2d 1029 (2005). We address the defendants' claims in turn.

A

Claims of Prosecutorial Impropriety During Closing Argument

The defendants both claim that the prosecutor engaged in impropriety during closing argument. Specifically, the defendants contend that impropriety

occurred when the prosecutor (1) vouched for the credibility of the complaining witness and (2) suggested that two witnesses failed to identify the defendants in court because they were intimidated by them. Tok additionally claims that the prosecutor diverted the jury's attention from the facts of the case by suggesting that the jury had a duty to find the defendants guilty. On the basis of our review of the record, we do not agree that impropriety occurred.

Because the claimed prosecutorial impropriety occurred during closing arguments, we advance the following legal principles. "[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [an impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Farr*, 98 Conn. App. 93, 106, 908 A.2d 556 (2006).

"The parameters of the term zealous advocacy are . . . well settled. The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover,

because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 363, 897 A.2d 569 (2006). With these legal principles in mind, we turn to the defendants' claims.

1

The defendants first argue that the prosecutor improperly expressed his personal opinion as to the credibility of Sheppard. Specifically, they claim that the prosecutor stated that Sheppard "was honest with you that he didn't want to testify" and stated that there were several factors that "add to his credibility." In light of the record as a whole, we do not believe these remarks constitute impropriety.

Our Supreme Court has stated: "[T]he state may argue that its witnesses testified credibly, if such an argument is based on reasonable inferences drawn from the evidence. . . . In addition, jurors, in deciding cases, are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to a jury's common sense in closing remarks." (Citations omitted; internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 365.

"[W]e are mindful . . . that closing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial [impropriety], they do suggest that a court should not lightly infer that a prosecutor intends an

ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Internal quotation marks omitted.) Id., 368. On the basis of our review of the record, we agree with the state that the prosecutor referred to specific testimony elicited from witnesses and asked the jury to evaluate how it pertained to Sheppard's credibility. Although the prosecutor could have expressed himself with greater precision, we cannot say that his argument constituted impropriety.

2

The defendants next argue that the prosecutor improperly suggested during closing arguments that two witnesses failed to identify the defendants in court because they were intimidated by them.

"It is well settled that [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Little*, 88 Conn. App. 708, 717–18, 870 A.2d 1170, cert. denied, 274 Conn. 916, 879 A.2d 895 (2005).

On the basis of our review of the record, we agree with the state that the prosecutor's argument was firmly rooted in the evidence presented at trial. Jourdain called Officer Sebastian Strano of the Danbury police department to testify as a witness. Strano testified that Osorio, the woman who was walking with Sheppard when the assault occurred, was unable to identify the assailants

on the night of the assault. On cross-examination by the prosecutor, Strano testified that in his sixteen years of experience as a police officer, witnesses to crimes often did not want to get involved for fear of possible retaliation. Tok's attorney then elicited testimony from Strano on recross-examination that his opinion was not based on anything Osorio had told him but rather was based on his professional experience. The prosecutor's reference in closing arguments to Strano's explanation of why Osorio failed to identify the defendants in court was fair and based on the facts in evidence and the reasonable inferences drawn from them. Furthermore, the prosecutor in no way insinuated that the defendants had threatened or intimidated Osorio. The prosecutor merely offered an explanation of why she failed to identify the defendants as the assailants.

Similarly, the defendants' argument that the prosecutor improperly suggested that Vega was too intimidated to make an in-court identification is without merit. During Tok's cross-examination of Vega, Tok's attorney asked Vega to stand and identify his client as one of the men he had witnessed in the alley. The prosecutor referenced this fact during his closing argument and invited the jury to decide whether Vega looked frightened. His comments were rooted in the evidence and were proper comments on the witness' demeanor. See *State* v. *Cobb*, 27 Conn. App. 601, 609, 605 A.2d 1385 (1992).

3

Tok claims that the prosecutor engaged in impropriety by diverting the jury's attention from the facts of the case. Tok claims that the prosecutor engaged in a monologue that (1) injected into the trial the issue that the criminal justice system protects civilization and the community and that it is the best system we have, (2) suggested that the members of the jury would be doing

their duty as members of the community and deliver justice by returning a guilty verdict, (3) asked the jurors to consider matters that were not in evidence when deliberating and (4) suggested that the jurors had an obligation to find Tok guilty. While we agree that "[a] prosecutor . . . may not appeal to the emotions, passions and prejudices of the jurors . . . or otherwise inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence"; (internal quotation marks omitted) *State* v. *Thompson*, 266 Conn. 440, 473, 832 A.2d 626 (2003); we do not agree that the prosecutor engaged in such conduct in the present case.

The prosecutor's comments, when read in the context of the entire trial, did not divert the jury's attention from the facts of the case. Rather than argue that the jurors had a duty or obligation to find the defendants guilty, the prosecutor argued that the jury could find them guilty despite the fact that Sheppard, the victim of the assault, did not want to move forward with the prosecution. Furthermore, the prosecutor made numerous references to the fact that the jury must reach a verdict on the basis of the facts and any reasonable inferences drawn from the facts. Considered in context, the remarks Tok complains of were not improper. See *State* v. *Aponte*, 66 Conn. App. 429, 455, 784 A.2d 991 (2001), cert. denied, 259 Conn. 907, 789 A.2d 995 (2002).

B

Tok's Claim of Prosecutorial Impropriety During Questioning of Witnesses

Tok next claims that the prosecutor engaged in impropriety during the questioning of certain witnesses. Specifically, Tok argues that the prosecutor engaged in impropriety by suggesting that two witnesses were lying and insinuating that Tok was a gang member. On the

basis of our review of the record, we do not agree that impropriety occurred.

1

The first portion of Tok's claim is that the prosecutor improperly expressed his personal opinion during trial by repeatedly asking a defense witness if she understood that she was under oath and that perjury is a felony.

The following additional facts are necessary for our resolution of the defendant's claim. During the course of the trial, Tok called Kelly Phen, a nineteen year old acquaintance, as an alibi witness. During cross-examination, the prosecutor revealed a number of inconsistencies in Phen's testimony regarding relatively insignificant facts. When the prosecutor gave Phen the opportunity to clarify her prior responses, she readily contradicted her prior sworn testimony. Later, at two junctures in Phen's testimony when the prosecutor sought to elicit key facts, he reminded Phen of her oath. Tok argues that the prosecutor's conduct improperly suggested that Phen was lying. Although his counsel did not raise any objection to the line of questioning at trial, Tok claims that these questions constituted impermissible statements of personal opinion.

The law is clear that it is improper for a prosecuting attorney to express his or her own opinion, directly or indirectly, as to the credibility of witnesses. E.g., *State v. Fauci*, 282 Conn. 23, 35, 917 A.2d 978 (2007); *State v. Bermudez*, 274 Conn. 581, 598, 876 A.2d 1162 (2005), aff'd after remand, 95 Conn. App. 577, 897 A.2d 661 (2006). "Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust

the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Fauci*, supra, 35.

In the present case, we do not agree that the prosecutor expressed his personal opinion that Phen was lying. Our review of the transcript reveals numerous instances when the prosecutor exposed inconsistencies in Phen's testimony. Although many of the inconsistencies were minor in nature, the cumulative effect was to discredit Phen. At junctures in Phen's testimony when the prosecutor sought to elicit key facts, he reminded Phen of her oath. In light of the numerous prior inconsistencies in Phen's testimony, we do not believe that any of the prosecutor's statements or questions expressed his personal opinion that Phen was lying.

2

The next portion of Tok's claim of prosecutorial impropriety is that the prosecutor deliberately violated a court order during his questioning of Phen. Specifically, the defendant claims that the prosecutor questioned Phen on whether the defendants were involved in gang activity in violation of a court order prohibiting such questions.

The following facts and procedural history inform our analysis. On June 7, 2005, the court granted Tok's motion in limine prohibiting "[a]ny references or speculation as to [Tok's] status as a member of a gang or gang affiliation . . . ." Thereafter, Phen testified that the defendants lived in the same neighborhood known as the "Brook," but that she was unsure if they were friends. The following colloquy then occurred:

"Q. Well, are there sometimes people that hang out in the Brook that might be members of different groups that don't like each other?

"A. What do you mean by 'members'?

"Q. People associate themselves with different gangs.

"[Defendant Tok's Counsel]: I object, Your Honor.

"The Court: Objection overruled.

"Q. Doesn't that sometimes happen?

"A. Can you repeat the question? I'm sorry, I wasn't listening.

"Q. Isn't it true that there can be sometimes different groups of people, even though they live in the same 'project'—to use your word—they might be members of different gangs and they don't like each other?

"A. I believe there may be. But I personally wouldn't know because I'm not from that neighborhood."

After the conclusion of Phen's testimony, Tok's counsel moved for a mistrial "based on the testimony that came into evidence regarding gangs." The court denied the motion.[8]

Although Tok's claim is rooted in an evidentiary violation, "appellate courts of this state have held that evidentiary violations of a court order should be reviewed as prosecutorial [impropriety], not evidentiary errors." *State* v. *Williams*, 102 Conn. App. 168, 176, 926 A.2d 7, cert. denied, 284 Conn. 906, 931 A.2d 267 (2007). We will review the claim, as "it is the severity of the [impropriety], considered in the context of the specific facts and circumstances of a particular case, as opposed to the intrinsic nature of the impropriety, that determines

---

[8] Tok has not challenged this ruling on appeal.

whether an impropriety is evidentiary or of constitutional magnitude." (Internal quotation marks omitted.) Id.

We first note that a prosecutor may not make an argument in violation of a court ruling. See *State* v. *Ubaldi*, 190 Conn. 559, 567–68, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). As previously discussed, in considering claims of prosecutorial impropriety, "we apply a due process analysis and consider whether the defendant was deprived of a fair trial. . . . A different standard is applied, however, when the claim involves deliberate prosecutorial [impropriety] during trial which violates express trial court rulings . . . . In such instances, [t]his court . . . has supervisory power to vacate a judgment of conviction and to order a new trial to deter prosecutorial [impropriety] which, while not so egregious as to deprive the defendant of a fair trial, is unduly offensive to the maintenance of a sound judicial process. . . . In determining whether the use of our supervisory powers to reverse a conviction is appropriate, we consider whether the effect of the challenged remark was to undermine the authority of the trial court's ruling . . . . We also consider the degree of prejudice suffered by the defendant as a result of the remark. . . .

"Our Supreme Court, however, has urged a cautionary approach in this regard, noting that [r]eversal of a conviction under our supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." (Citations omitted; internal quotation marks omitted.) *State* v.

*Sherman,* 38 Conn. App. 371, 384–85, 662 A.2d 767, cert. denied, 235 Conn. 905, 665 A.2d 905 (1995).

Tok's claim is premised on the prosecutor's deliberately violating a court order. Our review of the record, however, does not reveal that the prosecutor did in fact violate the court's order. The court order prohibited reference or speculation as to Tok's involvement in gangs or gang activity. The prosecutor's questioning was directed at whether there was gang activity in Tok's neighborhood and not whether Tok was involved with gangs or gang activity. Although this may seem like appellate hairsplitting, our view of the prosecutor's questioning is buttressed by the court's overruling Tok's objection to the prosecutor's question. The trial court is well aware of the scope of its orders. We, therefore, must afford great deference to its conclusion that the prosecutor did not violate either the words or spirit of those orders. As such, we do not agree with Tok that the prosecutor violated the court order. Accordingly, no impropriety occurred.

3

The final portion of Tok's claim is that the prosecutor improperly expressed his personal opinion during trial by asking another defense witness, Caroline Abba, if she understood that she was under oath and that perjury is a felony.

The following additional facts are necessary for our resolution of Tok's claim. As part of his defense, Jourdain called Abba, then a freshman at LaSalle University in Philadelphia, Pennsylvania, as his alibi witness. Abba testified that on August 26, 2004, she had returned early from her freshman college orientation and was with Jourdain at Tuxedo Junction during the night of the assault. She stated that they both were standing outside the club at about 1 a.m. when a group of people rushed toward an alley to witness a "commotion." Jourdain's

counsel then elicited testimony from Abba that she and Jourdain previously had dated and currently were friends. Counsel for Jourdain next asked Abba if she was "willing to perjure [herself] in court . . . for [Jourdain's] benefit." Abba responded in the negative.

On cross-examination by the prosecutor, Abba testified that her parents drove her to LaSalle University on the morning of August 26, 2004, and helped her move into her dormitory. Rather than attend freshman orientation events that evening, Abba had a friend drive her back to Danbury where she met Jourdain. After additional questioning by the prosecutor regarding Abba's attendance at orientation, he asked whether she knew she was under oath and wanted to change any of her answers. Counsel for Jourdain objected to the line of questioning. The court then excused the jury from the courtroom and permitted Abba, then eighteen years old, to discuss her testimony with her father. Abba thereafter testified that she was no longer sure about whether she was in Danbury on August 26, 2004, but that she believed she was there that night.

Tok now claims that the prosecutor committed impropriety by conveying his opinion that Abba was lying. A fair reading of the transcript of Abba's testimony reveals that no impropriety occurred. The record reveals that Abba offered wavering and contradictory answers throughout critical portions of her testimony. In light of this, and in light of the fact that the court granted a recess so Abba could consult with her father regarding her testimony, we cannot say that the prosecutor revealed to the jury his personal opinion that Abba was lying. Furthermore, it is telling that Jourdain's counsel similarly asked Abba if she were willing to perjure herself. On the basis of the record before us, we find no impropriety by the prosecutor.

## III

## JURY INSTRUCTIONS

Both of the defendants next claim that the court improperly instructed the jury on the essential element of intent. The defendants also raise separate additional claims. Jourdain claims that the court erred in referring to the defendants in the singular when giving its charge. Tok claims that the court improperly charged the jurors on both subdivisions of the attempt statute and failed to give the jury a specific unanimity instruction as to the theory of liability. We do not agree.

The defendants did not object to the court's instruction at trial and now seek review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. "[U]nder . . . *Golding*, a defendant may prevail on an unpreserved constitutional claim of instructional error only if, considering the substance of the charge rather than the form of what was said, [i]t is reasonably possible that the jury was misled." (Internal quotation marks omitted.) *State* v. *Serrano*, supra, 91 Conn. App. 244. In determining whether the jury was misled, "[i]t is well established that [a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge." (Internal quotation marks omitted.) *State* v. *White*, 97 Conn. App. 763, 773, 906 A.2d 728, cert. denied, 280 Conn. 939, 912 A.2d 476 (2006). "The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 128, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908,

124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). "[J]ury instructions need not be exhaustive, perfect or technically accurate, so long as they are correct in law, adapted to the issues and sufficient for the guidance of the jury." (Internal quotation marks omitted.) *Atkin* v. *Marko*, 83 Conn. App. 279, 283, 849 A.2d 399 (2004). With these legal principles in mind, we turn to the merits of the defendants' instructional claims.

A

Joint Claim of Improper Instructions on Intent

The defendants' joint claim is that the court improperly failed to limit its instructions to the jury on the element of intent to the specific intent of those crimes charged. Specifically, the defendants claim that the court's charge, which referred to both types of statutory intent as defined by General Statutes § 53a-3 (11), allowed the jury to find them guilty of the specific intent crimes of assault in the first degree by disfigurement, assault in the first degree with two or more persons present, attempt to commit assault, conspiracy to commit assault and accessory to assault on the basis of an intent to engage in conduct rather than an intent to cause the required specific result.[9] Although we find that the record is adequate for review and the claim is of constitutional magnitude, we conclude that the court's references to general intent did not deprive the defendants of a fair trial.[10]

The court gave the jury a lengthy charge on five separate counts, which included the following: "For you to find the defendant guilty of [assault in the first

[9] General Statutes § 53a-3 (11) provides: "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ."

[10] An improper instruction on an element of an offense is of constitutional magnitude. See *State* v. *Austin*, 244 Conn. 226, 235, 710 A.2d 732 (1998).

degree by disfigurement], the state must prove the following elements beyond a reasonable doubt. First, that the defendant intended to disfigure another person seriously and permanently or to destroy, amputate or disable permanently a member or organ of another person's body. . . . What the defendant intended is a question of fact for you to determine. You will recall my charge on intent.

\* \* \*

"For you to find the defendant guilty of [assault with two or more persons present], the state must prove the following elements beyond a reasonable doubt: (1) that the defendant intended to cause serious physical injury to another person; (2) that the defendant caused serious physical injury to that person or to another person; and (3) that the defendant did so while aided by two or more persons actually present. . . . The state must first prove beyond a reasonable doubt that the defendant intended to cause serious physical injury to another person. What the defendant intended is a question of fact for you to determine. Again, remember my charge on intent.

"The next element that the state must prove beyond a reasonable doubt is that acting with that intent, the defendant caused serious physical injury to another person. It does not matter whether the victim was the person upon whom the defendant intended to inflict such serious physical injury, if in fact you find such intent. It is sufficient, if you find beyond a reasonable doubt, that the defendant intended to cause serious physical injury to another person and that he in fact caused serious physical injury to that person or to some other person.

\* \* \*

"The defendant is charged with the crime of attempt to commit assault in the first degree, in that, with intent

to commit that crime, he intentionally engaged in conduct that would constitute the crime if the attendant circumstances were as he believed them to be . . . .

"The first element that the state must prove beyond a reasonable doubt is that the defendant had the kind of mental state required for the commission of the crime of assault in the first degree. You will recall my charge on intent and the elements of assault in the first degree.

"Next, the state must prove beyond a reasonable doubt that the defendant intentionally engaged in conduct that would constitute the crime of assault in the first degree if attendant circumstances were as he believed them to be. Or the state must prove beyond a reasonable doubt that the defendant intentionally did anything that, under the circumstances as he believed them to be, was an act constituting a substantial step in a course of conduct planned to culminate in his commission of the crime of assault in the first degree.

\* \* \*

"To constitute the crime of conspiracy, the state must prove the following elements beyond a reasonable doubt: (1) that there was an agreement between the defendant and one or more persons to engage in conduct constituting a crime, assault in the first degree in this instance; (2) that there was an overt act in furtherance of the subject of the agreement by any one of those persons; [and] (3) [that] there was the intent on the part of the defendant . . . that conduct constituting a crime be performed.

\* \* \*

"If you find that there was an agreement to engage in conduct constituting a crime and that the agreement was followed by an act or acts directed to achieve or further the objective of the conspiracy, you must still determine whether the defendant had criminal intent.

The defendant may not be found guilty unless the state has proven beyond a reasonable doubt that he had specific intent to violate the law when he entered into the agreement to engage in conduct constituting a crime.

"What a person's purpose or intention has been is largely a matter of inference. The only way in which a jury can determine what a person's purpose or intention was at any time, aside from that person's own testimony, is by determining what the person's conduct was and what the circumstances were surrounding that conduct and, from those, draw reasonable inferences as to what his purpose or intention was.

\* \* \*

"In order to be an accessory to a crime, the defendant must have the same criminal intent required for the crime to which he is an accessory, as I shall explain that intent to you in a moment. That is, he must have the intent to commit the crime of assault in the first degree, and where, as here, the state claims he is an accessory by aiding in the commission of that crime, he must have the intent to aid the principal perpetrator of the crime, that is, he must have the intent to aid the other persons in their actual commission of the crime. Now, you'll recall my charge on intent."

The defendants both argue that these instructions mischaracterize the crimes they were charged with by permitting the jury to find them guilty on the basis of intent to engage in conduct rather than an intent to cause the required specific result. As this court recently stated: "The defendant's claim is not novel. This court has addressed the issue presented by that claim in numerous, previous cases. [T]he definition of intent as provided in § 53a-3 (11) embraces both the specific intent to cause a result and the general intent to engage in proscribed conduct. . . . [I]t is improper for a court

to refer in its instruction to the entire definitional language of § 53a-3 (11), including the intent to engage in conduct, when the charge relates to a crime requiring only the intent to cause a specific result. . . . This court has further noted, however, that in cases in which the entire definition of intent was improperly read to the jury, the conviction of the crime requiring specific intent almost always has been upheld because a proper intent instruction was also given. The erroneous instruction, therefore, was not harmful beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Rivet*, 99 Conn. App. 230, 232–33, 912 A.2d 1103, cert. denied, 281 Conn. 923, 918 A.2d 274 (2007).

Although the court improperly instructed the jury on the entire definitional language of § 53a-3 (11), it thereafter properly instructed on the individual charges. First, the court stated that to find the defendants guilty of assault in the first degree by disfigurement, the jury had to find that the defendants intended to disfigure another person seriously and permanently. Next, the court instructed that to find the defendants guilty of assault in the first degree with two or more persons present, the jury had to find that the defendants intended to cause serious physical injury to another person while two or more persons were present. The court then instructed that to find the defendants guilty of attempt to commit assault, the jury had to find that the defendants had the mental state required for the commission of the crime of assault in the first degree and that the defendants intentionally engaged in conduct that would constitute the crime of assault in the first degree. The court further instructed that to find the defendants guilty of conspiracy to commit assault, the jury had to find that the defendants had the specific intent to violate the law when they entered into the agreement to engage in conduct constituting a crime. Finally, the court instructed that to find the defendants

guilty of accessory to assault, the jury had to find that the defendants had the intent to aid the perpetrator of the crime. The court repeated these proper instructions and slight variations thereof multiple times during its charge.

The defendants' claim arises from their critical dissection and artificial isolation of the improper references from the overall charge. The proper standard of review requires the charge to be considered as a whole. Our application of that standard leads us to conclude that because the court properly instructed the jury on specific intent within the context of its instructions on the specific charges, it was not reasonably possible that the jury was misled by the court's instruction. Because the defendants have failed to establish that the alleged constitutional violation clearly exists and clearly deprived them of a fair trial, this claim fails under the third prong of *Golding*.

## B

### Jourdain's Individual Claim

Jourdain additionally claims that the court improperly referred to the defendants in the singular when giving its charge.[11] Specifically, he claims that the

---

[11] Jourdain also claims that the court was required to give a special instruction about the dangers of eyewitness identification. The court instructed: "In appraising the identification of any witness, you should take into account whether the witness had adequate opportunity and ability to observe the perpetrator on the date in question. This will be affected by such considerations as the length of time available to make the observation, the distance between the witness and the perpetrator, the lighting conditions at the time of the offense, whether the witness had known or seen the person in the past and whether anything distracted the attention of the witness during the incident. You should also consider the witness' physical and emotional condition at the time of the incident, the witness' power of observation in general. In short, you must consider the totality of the circumstances affecting the identification.

"Remember, you must be satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime or you must find the defendant not guilty." We find that the court's instruction was proper. See *State* v. *Tatum*, 219 Conn. 721, 733–35, 595 A.2d 322 (1991).

court's charge misled the jury because no distinction was made between the actions of either defendant. Although the record is adequate for review and the claim is of constitutional magnitude,[12] this claim fails because there was no constitutional violation that deprived Jourdain of a fair trial.

The court began its charge by stating: "There are two defendants on trial here. Although the defendants are being tried together, you must consider the case against each one of them separately. That is, your findings in one case do not in themselves establish a basis for similar findings in the other case. Each defendant is to be considered as if he were on trial alone for the offense, or the offenses, for which he stands charged. You will be required, therefore, to render a verdict upon each defendant separately.

"The charges against each defendant are contained in different counts. Each count charges a separate crime joined for the convenience of the trial in one information. You must consider each count separately and decide whether . . . the state has proven each of the elements of that crime beyond a reasonable doubt.

"Except for . . . Jourdain's marijuana charge in count three, the state accuses the defendants separately

[12] Jourdain claims that by referring to the defendants in the singular, the jury was free to find him guilty on the basis of Tok's conduct. This claim is of constitutional magnitude because Jourdain's identity as the perpetrator is an essential element of all the crimes for which he was charged. "It is . . . constitutionally axiomatic that the jury be instructed on the essential elements of a crime charged." *State* v. *Williamson*, 206 Conn. 685, 708, 539 A.2d 561 (1988). "The due process clause of the fourteenth amendment protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) . . . ." (Citations omitted.) *State* v. *Gabriel*, 192 Conn. 405, 413–14, 473 A.2d 300 (1984). Consequently, the failure to instruct a jury on an element of a crime deprives a defendant of the right " 'to have the jury told what crimes he is actually being tried for and what the essential elements of those crimes are.' " Id., 414.

of violating the same laws. What I will charge you on the law applies to both men. You are to review the evidence against both men on a separate basis, evaluating each one individually, in light of the evidence and the law as I give it to you.

"Both men are charged with violating state statutes concerning assault in the first degree in counts one and two. The balance of the charges relate to criminal attempt to commit assault in the first degree, conspiracy to commit assault in the first degree and assault in the first degree as an accessory. . . . Jourdain, only, is also charged with illegal possession of marijuana in count three.

"The defendants have [pleaded] not guilty to the charges. From this point forward, I will use the singular to address both defendants."

Under these circumstances, the court's subsequent references to the defendants in the singular was not misleading. The court prefaced its remarks with a clear instruction that the jury must reach a verdict as to each defendant separately and that a guilty verdict against one defendant does not require a guilty verdict against the other. Our review of the charge as a whole, in light of the foregoing, is that it is not reasonably possible that the jury was misled.

C

Tok's Individual Claims

Tok also raises individual claims. He asserts that the court (1) improperly read the entire attempt statute to the jury, "which further focused the jury on conduct and not the result," and (2) failed to give the jury a specific unanimity instruction as to the theory of liability.

1

We agree with Tok that the court improperly read the entire attempt statute to the jury. We find this impropriety, however, to be harmless beyond a reasonable doubt.

The court instructed: "The first element that the state must prove beyond a reasonable doubt is that the defendant had the kind of mental state required for the commission of the crime of assault in the first degree. You will recall my charge on intent and the elements of assault in the first degree.

"Next, the state must prove beyond a reasonable doubt that *the defendant intentionally engaged in conduct that would constitute the crime of assault in the first degree if attendant circumstances were as he believed them to be.* Or the state must prove beyond a reasonable doubt that the defendant intentionally did anything that, under the circumstances as he believed them to be, was an act constituting a substantial step in a course of conduct planned to culminate in his commission of the crime of assault in the first degree." (Emphasis added.) Thereafter, the court further instructed: "The state must prove both intent and conduct beyond a reasonable doubt to obtain a conviction."

General Statutes § 53a-49 (a) defines criminal attempt. It provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." General Statutes § 53a-49 (a).

We agree with Tok that the court incorrectly focused the jury's consideration on whether he had committed an attempt pursuant to § 53a-49 (a) (1). "An instruction on that subdivision should be given when the evidence indicates that a perpetrator failed to accomplish or complete all the elements of a particular crime solely because the attendant circumstances were not as the perpetrator believed them to be, rendering the commission of the crime impossible. Examples of a violation of § 53a-49 (a) (1) would be a pickpocket's failure to complete a larceny because his hand was in an empty pocket, or an attempt by an accused to bribe a juror but mistakenly approaching a nonjuror. *United States* v. *Conway*, 507 F.2d 1047, 1050 (5th Cir. 1975); *Commonwealth* v. *Henley*, 504 Pa. 408, 410–11, 474 A.2d 1115 (1984); W. LaFave & A. Scott, Substantive Criminal Law § 6.3; see Conn. Gen. Stat. Ann. § 53a-49, commission comment (West 1983); see also D. Borden, Connecticut Penal Code Reference Manual (1971) § 5, pp. 5-5 and 5-6. This is consistent with the general rule applicable to inchoate offenses. Though the circumstances may be misapprehended, if one purposely engages in conduct which would constitute the elements of the crime if the attendant circumstances were as he believes them to be the actor is guilty of criminal attempt. . . .

"On the other hand, a court should charge on § 53a-49 (a) (2) when the evidence indicates that a perpetrator has done something which, under the circumstances as he believed them to be, is an act constituting a substantial step in a course of conduct planned to culminate in his commission of a particular crime. In other words, this sub[division] is directed at the more common attempt situations [wherein] the actor's conduct falls short of the completed offense for reasons other than impossibility. D. Borden, supra, p. 5-6; see *State* v. *Gilchrist*, 24 Conn. App. 624, 638–39 n.9, 591 A.2d 131, cert.

denied, 219 Conn. 905, 593 A.2d 131 (1991)." (Citations omitted; internal quotation marks omitted.) *State* v. *Gonzalez*, 222 Conn. 718, 724–25, 609 A.2d 1003 (1992).

In the present case, where Tok was charged with attempt to commit assault in the first degree and the evidence revealed an altercation with two or more persons present, the only relevant question was whether Tok, with the intent to cause serious physical injury to another person, had taken a substantial step, strongly corroborative of his purpose, in a course of conduct planned to culminate in the accomplishment of his intended result. The question to be resolved, therefore, is whether the court's charge, although imperfect, adequately conveyed to the jury the necessary elements of attempt to commit assault in the first degree pursuant to §§ 53a-49 (a) (2) and 53a-59 (a) (4). We conclude that it did.

Although the court's charge was overinclusive because it included both subdivisions of § 53a-49 (a), "[g]enerally, a trial court's overinclusive jury charge would not deny a defendant his due process rights. . . . Jurors are generally well equipped to analyze the evidence, and are in a position to be able to evaluate the testimony presented and to assess whether the evidence supported the charged theory." (Citations omitted.) *State* v. *Lopes*, 78 Conn. App. 264, 273, 826 A.2d 1238, cert. denied, 266 Conn. 902, 832 A.2d 66 (2003).

In order to find Tok guilty in light of the court's instruction, the jury must have found proven beyond a reasonable doubt that he assailed the victim with the intent to cause serious physical injury while being aided by two or more persons actually present. It cannot seriously be argued that if Tok assailed the victim with the intent to cause serious physical injury while being aided by two or more persons actually present, that the action taken, the assailing of the victim, was not a

substantial step in a course of conduct planned, i.e., intended or designed, to culminate in the commission of the crime of assault in the first degree, which step was strongly corroborative of Tok's criminal purpose. See *State* v. *Gonzalez*, supra, 222 Conn. 724–26. The fact that the court instructed the jury on both subdivisions of § 53a-49 (a) was harmless beyond a reasonable doubt. See *State* v. *Golding*, supra, 213 Conn. 240; see also *State* v. *Gonzalez*, supra, 724–26.

2

The second part of Tok's claim is that the court failed to give a unanimity instruction. Specifically, Tok claims that the court's instruction permitted the jury to find him guilty of all five charged crimes under either principal or accessorial theories of liability or under the theory of liability set forth in *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946), without requiring the jury to reach a unanimous verdict as to the theory of liability. We will review this claim because the record is adequate for review, and "[a] claim bearing on the defendant's right to a unanimous verdict implicates a fundamental constitutional right to a fair trial and is thus reviewable despite the defendant's failure to request a specific unanimity charge or to take proper exceptions." *State* v. *Famiglietti*, 219 Conn. 605, 619, 595 A.2d 306 (1991). We conclude, however, that Tok's claim fails under the third prong of *Golding*.

We view Tok's claim in light of the well established standard of review as set out by our Supreme Court in *State* v. *Famiglietti*, supra, 219 Conn. 605: "[W]e have not required a specific unanimity charge to be given in every case in which criminal liability may be premised on the violation of one of several alternative subsections of a statute. We have instead invoked a multipartite test to review a trial court's omission of such an instruction.

We first review the instruction that was given to determine whether the trial court has sanctioned a nonunanimous verdict. If such an instruction has not been given, that ends the matter. Even if the instructions at trial can be read to have sanctioned such a nonunanimous verdict, however, we will remand for a new trial only if (1) there is a conceptual distinction between the alternative acts with which the defendant has been charged, and (2) the state has presented evidence to support each alternative act with which the defendant has been charged." Id., 619–20; see also *State* v. *Sorabella*, 277 Conn. 155, 206–207, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006).

As a preliminary matter then, we look to whether the court sanctioned a nonunanimous verdict. Tok was charged with two counts of assault in the first degree, and one count each of attempt to commit assault in the first degree, conspiracy to commit assault in the first degree and assault in the first degree as an accessory. After the court gave individual instructions on each of the specific charged offenses, the court instructed the jury on the *Pinkerton* doctrine. The defendant concedes that the court, on more than one occasion, gave a general instruction that the jury's verdict had to be unanimous. Furthermore, Tok concedes that the court did not expressly state that unanimity was not required as to the theory of liability.

"[I]t is well established that the absence of language *expressly sanctioning* a nonunanimous verdict means that the defendant has not met the first part of the *Famiglietti* test. . . . Indeed, if the trial court did not sanction a nonunanimous verdict [the reviewing court] need not address the other parts of the *Famiglietti* test." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 419–20, 832 A.2d 14 (2003).

Our review of the court's charge reveals an absence of any language that could have led the jury to believe that a nonunanimous verdict was permissible. Furthermore, Tok's argument that the court implicitly sanctioned a nonunanimous verdict by failing to instruct specifically on unanimity likewise is unsupported by the record. We, therefore, do not reach the remainder of the *Famiglietti* test. Accordingly, we conclude that the court's instructions to the jury did not violate Tok's right to a fair trial by sanctioning a nonunanimous verdict.

For the reasons set forth previously, the claims of both defendants fail.

The judgments are affirmed.