STATE OF CONNECTICUT *v.* TYRONE KING
(SC 18093)

Rogers, C. J., and Norcott, Katz, Palmer and Schaller, Js.

Argued April 14—officially released November 18, 2008

*Elizabeth Kozlowski,* certified legal intern, with whom were *Timothy H. Everett,* special public defender, and, on the brief, *Thomas Feazell, Nicholas Mindicino, Keisha Palmer, John O'Donnell* and *Reagan Clyne,* certified legal interns, for the appellant (defendant).

*Melissa Patterson,* deputy assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *Donal Collimore, Jr.,* assistant state's attorney, for the appellee (state).

### Opinion

SCHALLER, J. The defendant, Tyrone King, appeals[1] from the judgment of conviction, rendered after a jury trial, of sale of narcotics in violation of General Statutes § 21a-277 (a),[2] and sale of narcotics within 1500 feet of

---

[1] The defendant appealed from the judgment of conviction to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 21a-277 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

a school in violation of General Statutes § 21a-278a (b).[3] The defendant raises four claims on appeal: (1) the trial court improperly failed to instruct the jury on the defense of entrapment; (2) the trial court improperly instructed the jury that the defendant could be convicted either as an accessory or as a principal; (3) the prosecutor engaged in certain improprieties that deprived the defendant of a fair trial; and (4) there was insufficient evidence to support the defendant's conviction of selling narcotics within 1500 feet of a school because the state offered no proof that the building alleged to be a school was an operating "public or private elementary or secondary school" as required by § 21a-278a (b). We affirm the judgment of conviction.

The jury reasonably could have found the following facts. On the night of June 28, 2004, the tactical narcotics team (team) of the Bridgeport police department initiated a narcotics investigation in the area of Washington Avenue and Sanford Place in Bridgeport. The team targeted the area for investigation because it was considered a "high drug area" in which narcotics officers previously had made numerous drug related arrests. Clive Higgins, an undercover officer assigned to the team, testified that his role in the investigation was to purchase drugs. Higgins was equipped with a listening

---

[3] General Statutes § 21a-278a (b) provides in relevant part: "Any person who violates section 21a-277 or 21a-278 by manufacturing, distributing, selling, prescribing, dispensing, compounding, transporting with the intent to sell or dispense, possessing with the intent to sell or dispense, offering, giving or administering to another person any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school . . . shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278. To constitute a violation of this subsection, an act of transporting or possessing a controlled substance shall be with intent to sell or dispense in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school . . . ."

device that enabled other team members to monitor his activity.

At approximately 10 p.m., Higgins approached the defendant, who was located on the corner of Washington Avenue and Sanford Place, and asked where he could "get some . . . slabs." Higgins explained to the jury that a slab is a "ziplocked [bag] containing narcotics or cocaine." The defendant then told Higgins, "I'll take you to my man," and asked Higgins how many slabs he wanted. After Higgins requested two slabs, he accompanied the defendant to a building located at 40 Sanford Place.

William Reilly, the officer who was assigned to watch Higgins and to monitor his conversations by way of the listening device, saw Higgins and the defendant enter the building and he heard "footsteps going up stairs." Higgins and the defendant proceeded to the fourth floor of the building, where the defendant knocked on the only door without an apartment number. When the occupant of the apartment opened the door, the defendant instructed Higgins to give the defendant money. Higgins handed the defendant a marked $20 bill, after which the defendant entered the apartment alone and closed the door. While the defendant was in the apartment, Higgins used the listening device to transmit information about his location to other officers on the team. A few seconds later, the defendant exited the apartment and handed Higgins two clear ziplock bags containing a white substance. Reilly saw Higgins and the defendant leave 40 Sanford Place together, and Higgins then signaled to Reilly that he was in possession of drugs.

Orlando Rosado, another officer on the team, subsequently arrested the defendant, and he retrieved a crack pipe from the defendant when the defendant was brought to police headquarters. The white substance

that the defendant handed to Higgins proved to be 0.143 grams of crack cocaine.

After his arrest, the defendant was charged in a long form information with sale of narcotics by a person who is not drug-dependent in violation of § 21a-278 (b), sale of narcotics in violation of § 21a-277 (a), and sale of narcotics within 1500 feet of a school in violation of § 21a-278a (b). As an affirmative defense, the defendant claimed that he was drug-dependent at the time of the crime, and he called an expert witness, Guay Chatfield, a licensed clinical social worker, to substantiate that defense. On December 15, 2004, the jury rendered a verdict acquitting the defendant of the count alleging sale of narcotics by a person who is not drug-dependent and finding him guilty of the remaining two charges. The trial court rendered a judgment of conviction as to those charges, from which the defendant appealed. We address the defendant's four claims in turn.

I

The defendant first claims that he was deprived of a fair trial by the trial court's failure to instruct the jury on the defense of entrapment. See General Statutes § 53a-15.[4] He claims that his testimony gave rise to a defense of entrapment, thereby necessitating an instruction. The defendant claims that several key differences between his testimony and Higgins' testimony, "supported the conclusion that the defendant . . . was induced to join [Higgins] ('a feigned accomplice') in a search for someone from whom to purchase . . . crack." Specifically, he relies on his testimony, in contrast to Higgins' testimony, that Higgins approached

---

[4] General Statutes § 53a-15 provides in relevant part: "In any prosecution for an offense, it shall be a defense that the defendant engaged in the proscribed conduct because he was induced to do so by a public servant . . . for the purpose of institution of criminal prosecution against the defendant, and that the defendant did not contemplate and would not otherwise have engaged in such conduct."

the defendant and promised to get him high, that the defendant did not know the person from whom they purchased crack, and that the defendant never touched the money or the drugs in question.[5]

As a preliminary matter, we address the state's claim that the defendant failed to preserve his claim for appellate review. The defendant acknowledges that he failed to request an instruction on entrapment or to take exception to the omission of an entrapment instruction from the trial court's jury charge as required by Practice Book § 42-16,[6] but he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

"Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the viola-

[5] The defendant testified during trial that when Higgins approached him and asked where he could obtain drugs, the defendant asked, "What's in it for me?" After Higgins promised to get the defendant high, Higgins and the defendant walked up Washington Avenue and down Sanford Place searching for drugs. The defendant testified that when they saw a man, whom the defendant did not know, standing outside of the apartment building at 40 Sanford Place, the defendant asked him, "[D]id he have some [slab] . . . ." The man indicated that he did and let the defendant and Higgins into the apartment building. The defendant testified that Higgins then purchased the drugs from the unknown man, and that the defendant never touched the money or the drugs.

[6] The defendant suggests that his exception to the court's charge on accessorial liability was sufficient to preserve his claim pertaining to the charge on entrapment. We disagree. The rules of practice require that "[c]ounsel taking the exception [to the charge] shall state distinctly the matter objected to and the ground of exception." Practice Book § 42-16. The purpose of this requirement is to "alert the court to any claims of error while there is still an opportunity for correction . . . ." (Internal quotation marks omitted.) *State* v. *Ramos*, 261 Conn. 156, 170, 801 A.2d 788 (2002). Because defense counsel's exception to the charge on accessorial liability failed to inform the court of concerns pertaining to the defense of entrapment, or to allow the court to address those concerns, we conclude that the claim was not preserved. See id.

tion of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 33 n.5, 917 A.2d 978 (2007). Should the defendant fail to meet any of these four conditions, "an appellate court is free to reject a defendant's unpreserved claim . . . ." (Internal quotation marks omitted.) *State* v. *Canales*, 281 Conn. 572, 580, 916 A.2d 767 (2007).

Although the record is adequate for review in this case, this court consistently has concluded that "the defense of entrapment is not of constitutional dimension." (Internal quotation marks omitted.) *State* v. *Grullon*, 212 Conn. 195, 211, 562 A.2d 481 (1989). In both *Grullon*, and *State* v. *Devino*, 195 Conn. 70, 73, 485 A.2d 1302 (1985), we declined to review the defendants' unpreserved claims pertaining to the trial court's charge on the defense of entrapment because the defense was not of constitutional magnitude. See also *State* v. *Preyer*, 198 Conn. 190, 197, 502 A.2d 858 (1985). Despite this clear precedent, the defendant urges us to conclude that the defense of entrapment is of constitutional magnitude on the ground that it is analogous to the defense of duress. The defendant offers no persuasive authority, however, to indicate why we should ignore well established precedent to the contrary. Accordingly, we decline to review the defendant's unpreserved claim because he has failed to satisfy the second prong of *Golding*.

## II

The defendant next claims that the trial court improperly instructed the jury on accessorial liability because: (1) the evidence in the state's case did not support such

an instruction; and (2) the court failed to inform the jury that it could not convict the defendant of the offenses charged on the ground that he was Higgins' accomplice because Higgins, as an undercover police officer, was not an actual principal. See *State* v. *Montanez,* 277 Conn. 735, 756, 894 A.2d 928 (2006) ("another person's commission of an offense is a condition precedent to the imposition of accessorial liability").

The following additional facts and procedural history are relevant to our resolution of this claim. On the first day of trial, the state filed a preliminary request to charge the jury on accessorial liability pursuant to General Statutes § 53a-8.[7] Defense counsel, at that time, indicated that she was planning to object to that portion of the charge after she had an opportunity to review it. After the close of evidence, the trial court indicated on the record that a charging conference had been held during which the court had stated that it would be instructing the jury on accessorial liability and defense counsel had voiced her intention to object to the charge. Defense counsel subsequently clarified that she was objecting to the prospective charge on the ground that an instruction on accessorial liability would confuse the jury because the state had charged the defendant as a principal, not as an accessory, and the state had not named any other party who could be considered a principal.[8] After the trial court instructed the jury and

---

[7] General Statutes § 53a-8 provides in relevant part: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

[8] Defense counsel stated: "[I]n regard to the accessory charge . . . the state charged . . . the defendant as a principal. In the cases that I've read in which the court indicated that an accessory can be charged, those cases were distinguished from this case in that there were named defendants, codefendants . . . other parties that were named, in the facts of the case

asked whether counsel had any exceptions to the charge, defense counsel merely indicated, "I believe I've placed my exception."

On appeal, the parties dispute whether the defendant's claim is properly preserved for appellate review. The state asserts that "[a]lthough defense counsel objected to the accessory instruction at trial, the grounds for that objection asserted at trial are not the same grounds that have been argued on appeal." The defendant counters that defense counsel's "various objections" to the inclusion of an instruction on accessorial liability, coupled with defense counsel's claim that the state's request for such an instruction was at odds with the state's theory of the case and the evidence presented, were sufficient to preserve the claim for appellate review. We agree with the state.

"It is well settled . . . that a party may preserve for appeal a claim that an instruction . . . was . . . defective either by: (1) submitting a written request to charge covering the matter; or (2) taking an exception to the charge as given. . . . [T]he purpose of the [preservation requirement] is to alert the court to any claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials. . . . Thus, the essence of the preservation requirement is that *fair notice* be given to the trial court of the party's view of the governing law and of any disagreement that the party may have had with the charge actually given." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Lin* v. *National Railroad Passenger Corp.*, 277 Conn. 1, 13, 889 A.2d 798 (2006); see also

that were included in the information, as well as in the presentation of the state's case. And there was an issue as to whether the defendant in that case was a principal or an accessory with regard to the codefendants.

"In this case, the state is claiming that [the defendant] is the only principal acting party, and, therefore, I believe that a charge of accessory would only confuse . . . the jury with regard to that allegation, and I don't believe that it is proper to charge it as such."

Practice Book § 42-16 (counsel taking exception shall state distinctly matter objected to and ground of exception).

In the present case, defense counsel objected to the charge on two specific grounds: (1) an instruction on accessorial liability would confuse the jury because the information charged the defendant as a principal only; and (2) no other individual was named as a principal. Neither ground alerted the trial court to defense counsel's concerns, voiced for the first time on appeal, that the evidence did not support a charge on accessorial liability and that the instruction failed to inform the jury that it could not convict the defendant of the offenses charged on the ground that he was Higgins' accomplice. Instead, both grounds rested solely on the premise that the information, which charged the defendant as a principal only and named no other person as a principal, was inconsistent with the accomplice liability charge, and would therefore confuse the jury. As a result, we conclude that the defendant failed to preserve his claim for appellate review.

The defendant argues, alternatively, that he is entitled to review under *Golding*. See part I of this opinion. We disagree. Although the record is adequate for review, the defendant's claim is not of constitutional magnitude and does not satisfy the second prong of *Golding*.

It is well established that "a factual insufficiency regarding one statutory basis, which is accompanied by a general verdict of guilty that also covers another, factually supported basis, is not a federal due process violation." *State* v. *Chapman*, 229 Conn. 529, 539, 643 A.2d 1213 (1994). The defendant acknowledges this premise, but argues that his claim is of constitutional magnitude because it alleges the improper submission of a *legally* insufficient theory of liability, as opposed to a factually insufficient theory. See id., 539–40. Specifi-

cally, the defendant claims that the trial court's inclusion of an instruction on accessorial liability created a reasonable possibility that the jury convicted him on the ground that he was an accomplice to a police officer, and failed to inform the jury that the law did not permit a conviction on that ground. In addition, the defendant claims that once the concept of accessorial liability was introduced, "the jury could only have identified Higgins [as] the person whom the defendant intended to assist." As a result, the defendant claims, the instruction created a reasonable possibility that the jury convicted the defendant on the basis of the legally incorrect theory that he assisted Higgins in purchasing drugs.

We reject the defendant's argument because it rests on the faulty premise that Higgins was the *only* person whom the defendant could have assisted. In fact, both the defendant's testimony and Higgins' testimony supported an instruction that the defendant assisted the unnamed dealer at 40 Sanford Place in selling the drugs to Higgins. Moreover, as the state points out in its brief, "under both the state's theory and the defendant's theory of the case, Higgins was the narcotics buyer, not the seller," and because the defendant was charged with selling narcotics, and not with purchasing them, "the trial court did not have a reason to instruct the jury that the defendant could not have been Higgins' accomplice . . . ." Thus, the defendant's claim that it was reasonably possible that the jury convicted him of a legally incognizable theory of liability is untenable. Because the defendant's claim is not of constitutional magnitude, we decline to review it. *State* v. *Golding*, supra, 213 Conn. 239–40.

## III

The defendant also claims that prosecutorial impropriety deprived him of his right to a fair trial and contravened the trial court's ruling on the defendant's motion

in limine to limit the prosecutor's references to the defendant's criminal record.[9] The defendant claims that the prosecutor went beyond the scope of the ruling, which permitted the prosecutor to refer to certain of the defendant's felony convictions as unnamed felonies and prohibited references to convictions that were more than ten years old. The defendant points to four alleged instances of impropriety: two during the state's cross-examination of the defendant; one during the state's cross-examination of Chatfield on the issue of drug dependency; and one during the state's closing argument. With the exception of the prosecutor's remarks during closing argument, which the state concedes were improper, we reject the defendant's claims of impropriety. In addition, we conclude that the prosecutor's remarks during closing argument did not deprive the defendant of a fair trial.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[T]he touchstone of due process analysis in cases of alleged [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to

---

[9] The defendant's motion in limine sought to limit the prosecutor's references to the defendant's prior felony convictions during cross-examination. Although the defendant's criminal record, dating from 1982, included numerous felony convictions, the trial court permitted reference to the following felony convictions as unnamed felonies only: six convictions in 2000; two convictions in 1999; one conviction in 1994; and two convictions in 1992.

make the resulting conviction a denial of due process.
. . . In determining whether the defendant was denied
a fair trial . . . we must view the prosecutor's [actions]
in the context of the entire trial. . . .

"[I]t is not the prosecutor's conduct alone that guides
our inquiry, but, rather, the fairness of the trial as a
whole. . . . We are mindful throughout this inquiry,
however, of the unique responsibilities of the prosecu-
tor in our judicial system. A prosecutor is not only an
officer of the court, like every other attorney, but is
also a high public officer, representing the people of
the [s]tate, who seek impartial justice for the guilty as
much as for the innocent. . . . By reason of his [or
her] office, [the prosecutor] usually exercises great
influence upon jurors. [The prosecutor's] conduct and
language in the trial of cases in which human life or
liberty [is] at stake should be forceful, but fair, because
he [or she] represents the public interest, which
demands no victim and asks no conviction through the
aid of passion, prejudice or resentment. If the accused
be guilty, he [or she] should [nonetheless] be convicted
only after a fair trial, conducted strictly according to
the sound and well-established rules which the laws
prescribe." (Citations omitted; internal quotation marks
omitted.) *State* v. *Fauci*, supra, 282 Conn. 32–33. Having
set forth these legal principles, we turn to the defen-
dant's claim.

As a preliminary matter, the defendant concedes that
he did not object to two of the alleged instances of
prosecutorial impropriety at trial, and that he failed to
state the grounds for his objections to the remaining two
instances. "Once prosecutorial impropriety has been
alleged, however, it is unnecessary for a defendant to
seek to prevail under *State* v. *Golding*, [supra, 213 Conn.
239–40], and it is unnecessary for an appellate court to
review the defendant's claim under *Golding*. . . . The
reason for this is that the touchstone for appellate

review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)." (Citation omitted; internal quotation marks omitted.) *State* v. *Fauci*, supra, 282 Conn. 33.

A

We turn first to the alleged improprieties during the prosecutor's cross-examination of the defendant. The defendant claims that the prosecutor violated the trial court's ruling on the motion in limine[10] by asking the defendant about how many times he had been convicted and by referencing the ten year limitation period set by the trial court in its ruling on the motion in limine.[11]

[10] The defendant does not claim that the prosecutor's conduct constituted a "deliberate disobedience of a trial court's orders requiring reversal pursuant to this court's supervisory authority." *State* v. *Ortiz*, 280 Conn. 686, 701–702 n.12, 911 A.2d 1055 (2006). The standard for reviewing a claim of deliberate disobedience is different because "such misconduct involves prejudice to the entire judicial system, in addition to prejudice to the defendant. . . . [A] new trial ordered because of a prosecutor's deliberate violation of trial court rulings is ordered pursuant to this court's supervisory powers, rather than to remedy the violation of the defendant's due process rights." (Internal quotation marks omitted.) Id.

[11] The following colloquy occurred during the prosecutor's cross-examination of the defendant:

"Q. So, in the year 2000, you were convicted how many times of a felony?
"A. Four or five.
"Q. Four or five. You don't remember?
"A. No.
"Q. Would it surprise you to know you were convicted six times?
"A. I was convicted, yes.
"Q. Six—six felonies, not four or five?
"A. Yes.
"Q. In the year 2000?
"A. Yes.
"Q. You have so many felony convictions you can't keep up with it?
"A. No, not really. I don't pay attention to it.
"Q. You don't pay attention. No big deal?
"A. I didn't say it's not a big deal, but it happened.
"Q. How many times were you convicted of a felony in 1999?

The defendant alleges that the prosecutor's questions improperly implied that the defendant's criminal history was more extensive than the trial court had ruled was admissible. We disagree.

During direct examination, the defendant admitted that he had been convicted of six felonies in 2000, two felonies in 1999, one felony in 1994, and one felony in 1992. During cross-examination, the prosecutor first asked the defendant how many times he had been convicted during 2000, and then asked how many times he had been convicted during 1999. Although the defendant had testified about the very same information during direct examination, he seemed reluctant or unable to answer the prosecutor's questions. At that point, the prosecutor stated: "[Y]ou've got some other felony convictions, too? . . . Ballpark, how many [convictions] do you think you have?" When the defendant

---

"A. Two, three.

"Q. Two or three. Okay. Would it surprise you to know there was only two that year?

"A. Something like that, yeah.

"Q. Something like that. Okay. And you've got some other felony convictions, too?

"A. Yes, I believe so.

"Q. Ballpark, how many do you think you have?"

At that point, defense counsel objected to the prosecutor's question, and the trial court sustained the objection. The colloquy between the prosecutor and the defendant then continued:

"Q. Just within the last ten years, how many do you have?

"A. I can't really tell you, because when they charge you with a charge, you can have one charge and it wind[s] up . . .

"Q. I'm not talking about charges.

"A. . . . with five.

"Q. I'm talking about convictions. How many convictions—how many felony convictions?

"A. I don't know.

"Q. Not how many times you've been arrested.

"A. I don't know.

"Q. You don't know. It just happens so often you just can't keep up with it; is that about right?

"A. I don't know."

objected to this question generally, the prosecutor clarified, "Just within the last ten years, how many do you have?" It is clear that this questioning, when considered in the context of the entire cross-examination, was focused on clarifying the number of times the defendant had been convicted within the time period permitted by the trial court's ruling, and was not an improper attempt to go beyond the scope of the ruling, as the defendant claims. Moreover, because the defendant already had testified during direct examination that he had been convicted of multiple felonies during a lengthy time period, the prosecutor's questions pertaining to the same convictions were no more likely to paint the defendant as a "career criminal," as the defendant contends, than the defendant's own testimony, especially when the trial court specifically had instructed the jurors that they could not draw such an inference from evidence of the defendant's prior convictions.[12] We therefore conclude that the prosecutor's questions during cross-examination of the defendant were not improper.

## B

The defendant also contends that the prosecutor violated his right to a fair trial and contravened an order of the trial court during cross-examination of Chatfield. Specifically, the defendant claims that the prosecutor improperly posed a hypothetical question about the defendant's criminal record and how it had impacted Chatfield's conclusion as to whether the defendant was dependent on drugs at the time of the incident.

The following additional facts are relevant to the defendant's claim. Before Chatfield testified to the jury,

---

[12] Immediately after the defendant's testimony on direct examination, the trial court gave a limiting instruction expressly prohibiting the jury from considering testimony concerning the defendant's prior convictions "as evidence that the [defendant] is a person of bad character or has a tendency on his part to commit criminal acts."

the court conducted a voir dire of the witness, during which Chatfield stated that she had used the defendant's drug possession convictions to corroborate the defendant's assertions that he had had a substance abuse problem for some time. Consequently, the state sought permission to question her as to her use of the defendant's criminal record and argued that "previously unnamed felonies [should] now be named." The trial court ruled that the prosecutor, in questioning Chatfield about her use of the defendant's record, could name the charge of possession, or could refer to "drug convictions," but could not name the defendant's convictions for sale of narcotics.[13]

During direct examination, in the presence of the jury, Chatfield testified that she had evaluated the defendant and had concluded that he was drug-dependent at the time of the crimes charged. During cross-examination, when the prosecutor questioned Chatfield about her use of the defendant's criminal record in forming her conclusion, Chatfield stated that the facts underlying the defendant's drug convictions were not important to her evaluation, and that she had used the convictions for the sole purpose of corroborating statements made by the defendant and his sisters. When Chatfield reiterated, in response to several questions, that the facts underlying the convictions were insignificant to her, the prosecutor stated: "Let's just say for hypothetical purposes . . . [that] he was convicted for sale."

---

[13] The prosecutor and the trial court engaged in the following colloquy:

"The Court: You can . . . talk about the possession charges, which were used by her for corroborative purposes. Not the other charges, because the only reason you'd be requesting them is to determine why she didn't use them. . . .

"[The Prosecutor]: So we can't—we can't name [the] sale?

"The Court: Correct. Or intent to sell.

"[The Prosecutor]: Okay. But we can name the possession?

"The Court: Possession. If you decide you want to do that. If you want— or you just want to put it in terms of drug—drug convictions."

Defense counsel immediately objected to the question, and the trial court instructed the jurors to "ignore that question."

The defendant argues on appeal that the prosecutor's question was improper because it violated the trial court's ruling prohibiting the prosecutor from naming the defendant's convictions for sale of narcotics. The state contends, to the contrary, that the question did not violate the trial court's ruling because it referred to the crime of sale hypothetically and did not reference charges for which the defendant actually had been convicted, and because the ruling did not prohibit all references to drug sale convictions. We agree with the state.

In *State* v. *Tok*, 107 Conn. App. 241, 260–63, 945 A.2d 558, cert. denied, 287 Conn. 919, 951 A.2d 571 (2008), the Appellate Court rejected a similar claim. The defendant in *Tok* claimed that the prosecutor had violated the trial court's ruling on a motion in limine that prohibited the prosecutor from referring to a witness' membership in a gang or gang affiliation. Id., 260. During cross-examination of the witness, the prosecutor stated, "[p]eople associate themselves with different gangs," to which defense counsel immediately objected. (Internal quotation marks omitted.) Id., 261. After the trial court overruled the objection, the prosecutor asked: "Isn't it true that there can be sometimes different groups of people . . . they might be members of different gangs . . . ?" (Internal quotation marks omitted.) Id. Although the defendant in *Tok* claimed that the prosecutor deliberately had violated a court order,[14] the Appel-

_____

[14] Although the Appellate Court applied a different standard in *Tok*, because the defendant claimed that the prosecutor's violation was deliberate and required the Appellate Court to invoke its supervisory powers; *State* v. *Tok*, supra, 107 Conn. App. 262; see also *State* v. *Ortiz*, 280 Conn. 686, 701 n.12, 911 A.2d 1055 (2006); the underlying determination of whether the prosecutor violated the trial court's ruling on the motion in limine is instructive in this case.

late Court determined that the order had not been violated because the prosecutor's questioning "was directed at whether there was gang activity in [the defendant's] neighborhood and not whether [the defendant] was involved with gangs or gang activity." Id., 263.

Likewise, the prosecutor's questioning in the present case was focused on exposing flaws in Chatfield's evaluation methods by highlighting that she had concluded that the defendant was drug-dependent without considering the types and underlying facts of the defendant's drug convictions, and was not directed at establishing that the defendant actually had been convicted of selling drugs. The single objectionable question in this case, which was posed hypothetically and did not refer to an actual conviction, is similar to the prosecutor's general reference to gang activity in *Tok*, which the Appellate Court distinguished from an actual inquiry into the witness' gang affiliation. Id. In this case, as in *Tok*, the distinction between proper and improper questioning is subtle. Although the prosecutor in this case approached the line distinguishing the two, we cannot conclude that he crossed that line. Because the prosecutor did not refer to or ask whether the defendant had an actual conviction for sale of narcotics, and because his hypothetical reference to a conviction for selling drugs did not violate the trial court's ruling, we conclude that the prosecutor's questioning was not improper.

C

Finally, the defendant argues that one of the prosecutor's remarks during his rebuttal closing argument to the jury constituted prosecutorial impropriety. The prosecutor, in discussing Chatfield's testimony, stated: "Moreover, [in] all of [the defendant's] other convictions, was he ever found to be drug-dependent? No." The state concedes that the prosecutor's statement was improper because it referred to the defendant's prior

use of the drug dependency defense when there was no evidence in the record that the defendant unsuccessfully had invoked that defense with respect to prior convictions. The state argues, however, that the impropriety did not deprive the defendant of a fair trial. We agree.

"To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . This inquiry is guided by an examination of the following *Williams* factors: the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 396, 897 A.2d 569 (2006); *State* v. *Williams*, supra, 204 Conn. 540.

The state does not argue, in this case, that the comment was invited by the defense. With respect to the second and third *Williams* factors, the misconduct, which consisted of a single remark, was neither frequent nor severe. "In determining whether the prosecutorial impropriety was severe, this court consider[s] it highly significant that defense counsel failed to object to . . . the improper [remark], [to] request curative instructions, or [to] move for a mistrial. . . . A failure to object demonstrates that defense counsel presumably [did] not view the alleged impropriety as prejudicial

enough to jeopardize seriously the defendant's right to a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Fauci,* supra, 282 Conn. 51. Defense counsel did not object to the improper comment in this case. In addition, the fact that the jury ultimately acquitted the defendant of the charge of sale of narcotics by a person who is not drug-dependent indicates that the impropriety, which pertained solely to the defense of drug dependency, was not severe.

We turn now to whether the impropriety was central to the critical issue in this case. As the defendant acknowledges in his brief, the central theme in this case was "the credibility of the defendant versus the credibility of a police officer." The prosecutor's comment pertaining to drug dependency had no bearing on the issue of credibility. Moreover, although the impropriety was relevant to the issue of drug dependency, the jury obviously credited that defense, despite the prosecutor's remark, because it acquitted the defendant of the charge of sale of narcotics by a person who is not drug-dependent.

As to the issue of whether the trial court adopted curative measures to ameliorate the impropriety, it is significant that defense counsel did not object to the impropriety when it occurred nor did she request curative instructions. As noted previously, defense counsel's failure to voice her objection to the comment or to request a curative instruction "mitigates against a finding that this misconduct by itself deprived the defendant of [a] fair trial." *State* v. *Ortiz,* 280 Conn. 686, 707–708, 911 A.2d 1055 (2006).

Finally, the state's case was strong. As the defendant acknowledges in his brief, credibility was the deciding factor in this case. The testimony of the state's key witness—Higgins—was corroborated by other police officers, whereas the defendant's version of events was

unsubstantiated.[15] In addition, both the defendant and Chatfield testified that the defendant had an extensive criminal history, which served to undermine his credibility. See Conn. Code Evid. § 6-7 (evidence that witness has been convicted of crime punishable by imprisonment of more than one year admissible to impeach credibility).

After considering the single instance of prosecutorial impropriety in the context of the entire trial, and applying the standard set forth in *Williams*, we conclude that the prosecutor's improper comment did not deprive the defendant of his due process right to a fair trial. We therefore reject the defendant's claim that he was entitled to a new trial.

## IV

The defendant's final claim is that the state adduced insufficient evidence to sustain his conviction of sale of narcotics within 1500 feet of a school in violation of § 21a-278a (b). He contends that the state did not meet its burden of proving that the drug transaction had occurred within 1500 feet of a school because there was no testimony establishing that the school identified in the information as Kolbe Cathedral High School was an operating private secondary school. We reject the defendant's claims.

The following facts are relevant to our resolution of this claim. The state alleged in a long form information that the defendant had sold narcotics within 1500 feet of "the real property comprising a private secondary school, to wit: Kolbe Cathedral High School . . . ."

---

[15] The defendant argues that his testimony was corroborated by the testimony of a family friend, Anthony Hicks. Although Hicks did corroborate the defendant's account of where the arrest took place, Hicks did not testify concerning any other issue in the case. Moreover, Hicks' credibility was called into question by his admission that he had been convicted of several felonies and had known the defendant all of his life.

At trial, Higgins identified 40 Sanford Place and Kolbe Cathedral High School on a map that had been introduced as a defense exhibit. Pointing to the school on the map, Higgins said, "I believe the school is this right here." When the prosecutor asked, "And that would be Kolbe Cathedral," Higgins answered, "Right." Reilly later testified that 40 Sanford Place was within 1500 feet of a school, and identified the school as "Kolbe Cathedral High School." Likewise, Rosado testified that the transaction took place within 1500 feet of a school identified as "Kolbe Cathedral." Finally, James DeSanty, an investigator for the state's attorney's office, testified that he measured the precise distance between the locations in question. When the prosecutor asked him the distance between "40 Sanford Place [and] Kolbe Cathedral High School," DeSanty answered, "911 feet."

At the conclusion of the trial, the court instructed the jury that in order to find the defendant guilty of the count alleging the sale of narcotics within 1500 feet of a school, it was required to find "that [the alleged transaction] occurred in or on or within 1500 feet of the real property of a public or private elementary or secondary school. An elementary or secondary school is a school for any . . . combination of grades below grade seven. A secondary school is a school for any combination of grades seven through twelve, and may include any separate combination of grades of five and six or grades seven and eight." Defense counsel neither requested a particular definition of the term "school," nor took exception to trial court's charge.

Although the defendant's claim was not preserved at trial, we review it, nonetheless, because "any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*." (Internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 76 n.7, 905 A.2d 1101 (2006), cert. denied, 549

U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007). In reviewing the defendant's sufficiency claim, we apply a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Davis*, 283 Conn. 280, 329, 929 A.2d 278 (2007).

The essential elements of the crime of sale of narcotics within 1500 feet of a school are proof that the defendant sold narcotics and proof that the location of the transaction was within 1500 feet of a school. See *State* v. *Denby*, 235 Conn. 477, 481, 668 A.2d 682 (1995); *State* v. *Pagan*, 100 Conn. App. 671, 674–75, 918 A.2d 1036, cert. denied, 282 Conn. 919, 925 A.2d 1102 (2007). In *State* v. *Padua*, 73 Conn. App. 386, 406–12, 808 A.2d 361 (2002), rev'd in part on other grounds, 273 Conn. 138, 869 A.2d 192 (2005), the Appellate Court considered a sufficiency claim pertaining to the location element in the portion of § 21a-278a (b) that prohibits drug sales within 1500 feet of a public housing project. The Appellate Court rejected the defendant's claim that the location element required the state to establish that "the Village Heights Apartments . . . was a state or federally subsidized multifamily housing project and that the housing project was run by a nonprofit corporation . . . ." Id., 408. The court stated that "the element in issue that the state had to prove was that the criminal activity took place in a public housing project"; id., 410; and concluded that the testimony of the property manager and a police officer that the apartment complex was a public housing project was sufficient to prove that element. Id., 409.

Similarly, in *State* v. *Jeffreys*, 78 Conn. App. 659, 677–81, 828 A.2d 659, cert. denied, 266 Conn. 913, 833

A.2d 465 (2003), the Appellate Court held that a police officer's affirmative response to the prosecutor's question as to whether Trumbull Gardens was a "public housing project" was sufficient to support the defendant's conviction for selling narcotics within 1500 feet of a public housing project in violation of § 21a-278a (b). Finally, in *State* v. *Pagan*, supra, 100 Conn. App. 675, the Appellate Court stated, albeit in dicta, that the rule articulated in *Jeffreys* also would apply in cases involving the sale of narcotics within 1500 feet of a school. The court noted that a police officer had testified "unequivocally and without objection or challenge that the sale occurred within 1500 feet of Vincent E. Mauro School," and remarked that "[t]his testimony alone would have been enough to satisfy the location element of the crime. See *State* v. *Jeffreys*, [supra, 678–81]." *State* v. *Pagan*, supra, 675.

Consistent with these cases, we reject the defendant's claim that the state failed to satisfy its burden of proof because it did not introduce sufficient evidence to prove that Kolbe Cathedral High School was an operating private secondary school. There was ample evidence from which the jury could have concluded beyond a reasonable doubt that Kolbe Cathedral High School was a school within the meaning of § 21a-278a (b). Four witnesses—DeSanty, Higgins, Reilly and Rosado—testified that 40 Sanford Place, where the narcotics transaction occurred, was within 1500 feet of a school. They referred to that school as "Kolbe Cathedral High School" or "Kolbe Cathedral." In the present case, as in *Pagan*, the witnesses testified "unequivocally and without objection or challenge . . . ." (Internal quotation marks omitted.) *State* v. *Pagan*, supra, 100 Conn. App. 675. Defense counsel never suggested that the witnesses were incompetent to testify that Kolbe Cathedral High School constituted a school or questioned their testimony that it was a school. In addition, it is

axiomatic that jurors "[i]n considering the evidence introduced in a case . . . are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life . . . ." (Internal quotation marks omitted.) *State* v. *Roth*, 104 Conn. App. 248, 256, 932 A.2d 1071 (2007). Although the defendant contends otherwise, the jurors, without question, were able to determine on the basis of the testimony adduced at trial and their common knowledge about the familiar topic of school, that Kolbe Cathedral High School constituted a school, as that term was identified by the trial court's instructions. Under the standard set forth in *Padua, Jeffreys* and *Pagan*, which we find persuasive, we conclude that the state presented sufficient evidence to establish that Kolbe Cathedral High School was a school within the meaning of § 21a-278a (b).[16]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[16] We reject the defendant's argument that the state, by alleging that Kolbe Cathedral High School was a private secondary school, became obligated to prove that the school was, in fact, a private secondary school. Although the state generally is limited to proving an offense charged in the manner alleged in the information, "the inclusion of additional details in the charge does not place on the state the obligation to prove more than the essential elements of the crime." *State* v. *Sam*, 98 Conn. App. 13, 38, 907 A.2d 99, cert. denied, 280 Conn. 944, 912 A.2d 478 (2006).