STATE OF CONNECTICUT *v.* TAVORUS L. FLUKER
(AC 30638)

DiPentima, C. J., and Alvord and Foti, Js.

Argued May 18—officially released August 24, 2010

*Heather M. Wood*, deputy assistant public defender, for the appellant (defendant).

*Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Tavorus L. Fluker, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a (a), assault in the first degree in violation of General Statutes § 53a-59 (a) (5) and criminal possession of a firearm in violation General Statutes § 53a-217 (a) (1). On appeal, the defendant claims that (1) the state violated the constitutional prohibition against presenting evidence of his post-*Miranda*[1] silence in violation of *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct 2240, 49 L. Ed. 2d 91 (1976), and (2) the prosecutor committed prosecutorial impropriety by deliberately disregarding a court order regarding the admissibility of certain evidence involving police efforts to locate the defendant. We disagree and, accordingly, affirm the judgment of the trial court.

The following procedural history and facts, which the jury reasonably could have found, are relevant to the appeal. On the evening of February 9, 2007, the victim, Lewis Camby III, went to Sully's Café, a tavern in Groton. Shortly after arriving, he encountered the defendant. After exchanging greetings, the defendant asked the victim, "what's up with that $300 that you owe Danette [Robinson]."[2] After a brief discussion, the two men decided that neither of them wanted to make an issue over the debt owed to Robinson. Subsequent to this conversation, the victim continued socializing within the bar and observed the defendant leave

---

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] The victim said that he knew the defendant through his longtime friend, Robinson, and would see him frequently at her apartment. The victim also said that he owed Robinson $300 for an unpaid debt.

through a door located in the poolroom. Upset that the defendant had interfered in his personal business, the victim called Robinson to ask why the defendant was inquiring about the money that he owed her. A short time later, the victim encountered the defendant again. This time, the defendant appeared in the poolroom near a door, which exited into the parking lot. During this encounter, after motioning to the victim to come over to where he was standing, the defendant grabbed his arm, put a pistol under his chin and said, "I kill [people] like you." Both men then proceeded toward the door in the poolroom which led into the parking lot. As the defendant exited, the victim remained close to the doorway, and the two men began to argue about the recent altercation. At this point, the defendant raised his arm and shot the victim in the chest with a large caliber automatic weapon.

Soon after the shooting, officers from the Groton town police department were dispatched to Sully's Café. Upon arriving, Sergeant Jeffrey Scribner entered the tavern and observed the victim being held up by two patrons leaning against the bar. Scribner noticed "a bloody hole in the upper left chest area and in the clothing" of the victim where he had been shot.[3] Despite being very emotional, the victim was alert enough to inform Scribner that he had been shot by "Tavorus."[4] When Scribner investigated further concerning the identity of the shooter, the victim told him that Tavorus was "Lamar's brother." Being familiar with Tavorus and

---

[3] The victim was treated for a single gunshot wound in his upper chest that resulted in trauma to both lungs and fractures to the sternum, a left rib and the left shoulder. The bullet lodged in his right shoulder and was never removed due to potential medical complications.

[4] Emergency medical personnel responding to the scene assessed the victim's mental status using the Glasco Coma Scale, a procedure health care providers employ to determine if a person is conscious and alert. The victim's score was fifteen, the highest rating on the scale, indicating that he was alert, conscious, oriented and able to communicate effectively.

Lamar, Scribner concluded that the defendant was the shooter. Police began a canvass of the crime scene and found a .45 caliber shell casing in the parking lot immediately outside a side door of the bar that led to the poolroom.

Shortly afterward, medical personnel arrived, stabilized the victim and transported him to William W. Backus Hospital. Officer Christopher Hoffman of the Groton town police department accompanied the victim in the ambulance and stayed with him at the hospital until he was flown by Life Star helicopter to Hartford Hospital. While waiting to be transported, the victim, once again, identified the defendant as the person who had shot him. The victim told Hoffman that the defendant shot him over an outstanding debt that he owed to a mutual friend. Following the victim's identification of the defendant as the person who had shot him, the police began looking for the defendant.[5]

The next morning, the defendant left Connecticut and drove to Philadelphia, Pennsylvania. He eventually went to Arkansas. At no time following the shooting did the defendant tell anyone he was leaving town or where he was going.[6] That same morning, a warrant was issued for the arrest of the defendant in connection with the shooting. As part of their investigation, police contacted other area police departments and the United States Marshals Service for assistance in locating the defendant. Police also informed the New London Day newspaper (Day) that a warrant had been issued. Subsequently, the Day published an article concerning the defendant and the shooting.

The defendant was arrested in Arkansas on July 11, 2008. He then was transported to Newburgh, New York,

---

[5] We note that the victim testified unequivocally at trial that the defendant was the person who shot him on February 9, 2007.

[6] The defendant testified that he had left town to overcome an alcohol addiction and to enter a rehabilitation center in Arkansas.

by the United States Marshals Service and taken into custody by Detectives Robert Emery and Kevin Curtis of the Groton town police department. Once the defendant was secured in the transport vehicle, Curtis advised him of his *Miranda* rights.[7] Subsequently, Emery asked the defendant "if he wanted to talk about the case." Emery testified that "[the defendant] just declined. He said he didn't want to talk about it, and I said okay. And he said he's got five witnesses that will say he didn't do it or wasn't involved." After Emery asked the defendant to supply the names of his alibi witnesses, the defendant responded, "no, that's all right."

Ultimately, the defendant was charged in a three count substitute information with attempt to commit murder, assault in the first degree and criminal possession of a firearm. The jury found the defendant guilty on all charges. The court sentenced him to a total effective term of twenty-five years incarceration. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the state violated the constitutional prohibition against presenting evidence of his post-*Miranda* silence in violation of *Doyle* v. *Ohio*, supra, 426 U.S. 610. Specifically, the defendant claims that his right to a fair trial was violated because the state impermissibly elicited testimony during its direct examination of Emery that the defendant refused to answer the officers' questions after receiving his *Miranda* warnings. In addition, the defendant claims that the state impermissibly referenced this testimony, concerning his post-*Miranda* silence, during its closing argument. We disagree.

---

[7] To ensure the accuracy of the administration of the *Miranda* rights, Curtis read the defendant his rights from the back of his identification card, which contained the verbatim language of the *Miranda* warnings.

The following additional facts are relevant to our review of the defendant's claim. On direct examination, Emery described the events that transpired after the defendant was taken into custody and advised of his right to remain silent. The following exchange between Michael L. Regan, the state's attorney, and Emery occurred at trial:

"Q. And after he was advised of his rights, was [the defendant] asked any questions?

"A. I asked if he wanted to talk about the case.

"Q. And what did he say?

"A. He just declined. He said he didn't want to talk about it, and I said okay. And he said he's got five witnesses that will say he didn't do it or wasn't involved.

"Q. And what did you do when he said he had five witnesses that said that he wasn't involved?

"A. I asked him for the names of the witnesses so I could talk to them.

"Q. And what did he say?

"A. He said no, that's all right."

The defendant did not object to this exchange. During cross-examination, defense counsel furthered this line of questioning by asking Emery whether the defendant ever told him that he would give the names of his alleged alibi witnesses to his attorney. Emery testified, "No, I don't recall [whether] he said that." During closing argument to the jury, the prosecutor recounted the defendant's testimony at trial, stating, "[a]lso, you remember [that the defendant] testified [that] when he turned himself in that he had [those alibi] witnesses,

but he never gave the police the names of [those] witnesses."[8] The defendant claims that the prosecutor's "reference to [the defendant's] invocation of his right to silence only served to stress . . . Emery's impermissible testimony" and harmed the defendant, given that the state did not have a strong case against the defendant, despite the eyewitness testimony provided by the victim.

At the outset, we set forth the standard of review. Because the defendant did not object to the testimony, the issue is unpreserved, and he now seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

Under the well established principles of *Golding*, a defendant "can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) Id.

---

[8] During cross-examination, the prosecutor asked the defendant, "Well, when you talked to the police and told them that you had, you know, a number of people that were going to put you somewhere else at the time the crime occurred, you wouldn't tell them the names at that time." The defendant explained, for the first time, at trial, that he did not provide the names of his alleged alibi witnesses because "I wanted to talk to my lawyer first."

On the basis of our review of the record, we conclude that the defendant has met the first two prongs of *Golding*.[9] See *State* v. *Camacho*, 92 Conn. App. 271, 279, 884 A.2d 1038 (2005), cert. denied, 276 Conn. 935, 891 A.2d 1 (2006). His claim, however, fails to satisfy the third prong of *Golding* because the defendant did not invoke his right to remain silent, therefore, no violation of his constitutional rights clearly exists under *Doyle*. We also note that because the claim raises a question of law, our review is plenary. See *State* v. *Stephen O.*, 106 Conn. App. 717, 729, 943 A.2d 477, cert. denied, 287 Conn. 916, 951 A.2d 568 (2008).

Under the third prong of *Golding*, we examine whether "the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . ." *State* v. *Golding*, supra, 213 Conn. 240. The defendant claims that Emery's testimony concerning the defendant's post-*Miranda* comments about having alibi witnesses "was part and parcel of his refusal to talk to police" and that his disinclination to answer Emery's follow-up question was a reaffirmation of his initial invocation of his fifth amendment right to remain silent. Consequently, the defendant claims that any elicitation and use of this testimony would violate his fifth and fourteenth amendment rights under the United States constitution. We are not persuaded and conclude that no constitutional violation clearly exists, and, therefore, the defendant's claim fails under the third prong of *Golding*.

---

[9] Relying on *State* v. *Brunetti*, 279 Conn. 39, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007), the state argues that the record is inadequate for review. We find *Brunetti* inapposite and conclude that the record is adequate for our review. See *State* v. *Bereis*, 117 Conn. App. 360, 372, 978 A.2d 1122 (2009) (finding record adequate for review of *Doyle* violation when police officer's testimony sufficiently "described the sequence of events [of] his actions and the defendant's actions after the defendant had been taken to the police barracks").

As this court previously has stated, "[a]ny inquiry into the admissibility of a statement obtained while a defendant is in custody must, of course, begin with [*Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)]. In that case, the United States Supreme Court held that the fifth and fourteenth amendments' prohibition against compelled self-incrimination requires that a suspect in police custody be informed specifically of his or her right to remain silent and to have an attorney present before being questioned. . . . The court further held that '[i]f the individual indicates in any manner, at any time prior to or during ·questioning, that he wishes to remain silent, the interrogation must cease' . . . and that '[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present.' . . . Furthermore, '[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' " (Citations omitted.) *State* v. *Smith*, 107 Conn. App. 746, 750–51, 946 A. 2d 926, cert. denied, 288 Conn. 905, 953 A.2d 650 (2008).

In *Doyle*, the United States Supreme Court expanded the protections it articulated in *Miranda*, holding that "the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding [on] two considerations: First, it noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important[ly], it observed that while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair

and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. . . . The court . . . reaffirmed *Doyle*'s reasoning in *Wainwright* v. *Greenfield*, 474 U.S. 284, 290, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986), in which it held that the defendant's silence following his arrest and receipt of *Miranda* warnings could not be used at trial to rebut his defense of insanity. The court reasoned: The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony." (Internal quotation marks omitted.) *State* v. *Bereis*, 117 Conn. App. 360, 373, 978 A.2d 1122 (2009).

We begin our analysis by noting that there is no talismanic "behavior or words" that will amount "to an expression of a defendant's right to remain silent." See *State* v. *Smith*, supra, 107 Conn. App. 752; but see *Berghuis* v. *Thompkins*, 560 U.S. 370, 382, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (unambiguous statement by an arrested person expressly articulating that he "wanted to remain silent or that he did not want to talk with the police" would be enough to invoke right to remain silent and end questioning). "Voluntary statements made to police during post-*Miranda* interrogations are admissible as long as the record contains no evidence of threats, promises or coercive or deceptive measures by the police." *State* v. *Smith*, supra, 752. The defendant argues that his statement to Emery that he had five alibi witnesses came after he declined to speak about the crime and, therefore, any use of that statement, or subsequent statements, by the state would violate his constitutional rights under *Doyle*. It is axiomatic, however, that *Doyle* is not applicable when a defendant has waived his right to remain silent. See *State* v.

*Boyd*, 295 Conn. 707, 749, 992 A.2d 1071 (2010). Moreover, "[o]nce an arrestee has waived his right to remain silent, the *Doyle* rationale is not operative because the arrestee has not remained silent and an explanatory statement assuredly is no longer 'insolubly ambiguous.' *By speaking, the defendant has chosen unambiguously not to assert his right to remain silent.* He knows that anything he says can and will be used against him and it is manifestly illogical to theorize that he might be choosing not to assert the right to remain silent as to part of his exculpatory story, while invoking that right as to other parts of his story. While a defendant may invoke his right to remain silent at any time, even after he has initially waived his right to remain silent, it does not necessarily follow that he may remain 'selectively' silent." (Emphasis added.) *State* v. *Talton*, 197 Conn. 280, 295, 497 A.2d 35 (1985).

For similar reasons set forth by our Supreme Court in *Talton*, *Doyle* is not applicable to the present case. The crucial distinction is that, here, the defendant did not remain silent after he was arrested and advised of his rights and, therefore, expressly chose to forgo his right to remain silent. See id.; see also *Berghuis* v. *Thompkins*, supra, 560 U.S. 384 (when *Miranda* warning given and understood, "an accused's uncoerced statement establishes an implied waiver of the right to remain silent"). The defendant argues that his initial disinclination to answer Emery's query about whether "he wanted to talk about the case" was an invocation of his fifth amendment right to remain silent. Furthermore, the defendant argues that his immediate, and unsolicited, reference to having five alibi witnesses, after his initial disinclination, was an affirmation that he did not want to discuss the case. Despite the defendant's assertion, "the refusal of a defendant to answer a particular question during a custodial interrogation is not an invocation of the right to remain silent." *State* v. *Smith,*

supra, 107 Conn. App. 752; see also *State* v. *Talton*, supra, 197 Conn. 295 (affirming trial court's finding that "the defendant's expression of a disinclination to answer one question was not tantamount to any assertion of his fifth amendment right"); *State* v. *Boyd*, supra, 295 Conn. 750 ("defendant had not invoked his right to remain silent by stating that he was not ready to discuss [exculpatory statements made] and, therefore, [police testimony] about those statements did not violate *Doyle*").

In *Talton*, the defendant freely offered information to the police after receiving his *Miranda* rights.[10] *State* v. *Talton*, supra, 197 Conn. 293. In response to the officers' questions, the defendant then refused to divulge the name of his alleged accomplice, saying, "I'd rather not tell you. I don't want to tell you." (Internal quotation marks omitted.) Id., 296. Subsequently, the court held that "[u]nder these circumstances, because the defendant failed to invoke his fifth amendment right to remain silent, the evidence was neither impermissibly elicited nor improperly admitted"; id.; and, thus, allowed police to testify at trial that the defendant declined to answer their question. Id., 294. In the present case, the defendant was read his *Miranda* warnings and asked if he wanted to discuss the case. After telling Emery that he did not want to discuss the case, the defendant began immediately to discuss potentially exculpatory evidence concerning alibi witnesses who would exonerate him from the charges. There is no evidence on the record to suggest that the defendant was provoked, coerced or even asked a question prior to this statement. Moreover, there is no evidence to

---

[10] The defendant argues that *Talton* is distinguishable from the present case because he, unlike the defendant in *Talton*, initially told police that he did not want to discuss the case. This argument, however, ignores that regardless of when the defendant's supposed refusal occurred, he nevertheless immediately volunteered the police an exculpatory statement.

indicate that the defendant asked to end the questioning or that he requested an attorney. He just continued to talk. Despite telling Emery that he was not going to discuss the case, the defendant's statements immediately following receipt of his *Miranda* warnings clearly indicated that he was not invoking his fifth amendment right to remain silent. After stating that he had multiple alibi witnesses, Emery asked the defendant the names of those people, and the defendant stated, "no, that's all right." In an attempt to distinguish *Talton*, the defendant argues that his initial remark that he did not want to talk, somehow preserved, and insulated, his fifth amendment right to remain silent, regardless of what he might say subsequently. This argument, however, fails to take into account our appellate precedent that holds that "[s]elective silence is not protected . . . ." (Citation omitted.) *State* v. *Torres*, 85 Conn. App. 303, 316, 858 A.2d 776, cert. denied, 271 Conn. 947, 861 A.2d 1179 (2004); id., 315 (*Doyle* analysis inapplicable when defendant "alternates between remaining silent and speaking"); see also *State* v. *Boyd*, supra, 295 Conn. 749–50; *State* v. *Casey*, 201 Conn. 174, 185–86, 513 A.2d 1183 (1986); *State* v. *Talton*, supra, 295; *State* v. *Smith*, supra, 107 Conn. App. 752; footnote 9 of this opinion.

We conclude that the defendant's initial disinclination that he did not want to discuss the case, followed immediately by his discussing the case, was not an invocation of his right to remain silent. Therefore, his willingness to speak, and, consequently, his refusal to provide names of alibi witnesses to police, was part of a conversation in which he freely engaged. We conclude that the defendant's claim fails under the third prong of *Golding* because the constitutional violation he alleges does not clearly exist. See *State* v. *Antwon W.*, 118 Conn. App. 180, 191, 982 A.2d 1112 (2009), cert. denied, 295 Conn. 922, 991 A.2d 568 (2010); see also *State* v. *Golding*, supra, 213 Conn. 240.

## II

Next, the defendant claims that the prosecutor committed prosecutorial impropriety by deliberately disregarding a court order regarding the admissibility of certain evidence involving police efforts to locate the defendant. Specifically, the defendant claims that the state deliberately violated the court's ruling by asking Detective John Varone of the Groton town police department if the Day had published an article after it was informed that the police had issued an arrest warrant for the defendant. We reject the defendant's claim of impropriety because we conclude that the state did not violate an evidentiary ruling of the court.

The following additional facts and procedural history are relevant to our resolution of the defendant's claim. At trial, the state sought, outside the presence of the jury, permission to admit evidence of (1) a wanted poster of the defendant that was marked for identification as state's exhibit twenty-eight and (2) a newspaper article from the Day reporting that police had issued a warrant for the defendant's arrest. After a lengthy colloquy between the parties and the court, the prosecutor requested express clarification from the court regarding its order: "I want to know what limitations I have on . . . Varone's and the [police] department's efforts to find [the defendant]." The court ruled: "For the moment, I'm ruling that the state can show what efforts were made; however, [it] cannot utilize state's exhibit twenty-eight for identification. *You may ask the detective whether or not the Day was contacted to further attempt to show*—to further attempt to disseminate the information, but not [what Day reporter Chuck] Powter wrote—*that the Day did publish something.*" (Emphasis added.) Thereafter, the court reiterated to defense counsel, "[a]nd again . . . at any time, you have the right to object . . . for us to hash it out, so

to speak." During the state's direct examination of Varone, he was asked if police notified "any of the local papers?" Varone responded that they had. When asked which newspaper he had contacted, the defendant objected. A conference among the court and counsel ensued off the record. Once back on the record, Varone was allowed to answer that he had contacted the Day. The prosecutor then asked Varone:

"Q. And was there an article published by the Day concerning [the defendant]?

"A. Yes, there was.

"Q. And was [the defendant] ultimately placed under arrest?

"A. Yes, he was."

The defendant did not object during that examination. He now argues that the prosecutor deliberately violated the court's order by introducing evidence that the newspaper published the article.[11] We disagree.

---

[11] Relying on *State* v. *Cromety*, 102 Conn. App. 425, 431, 925 A.2d 1133, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007), the state argues that the defendant is attempting to transform an "unpreserved evidentiary claim into one of prosecutorial impropriety [in order] to obtain review of this claim" and, thus, the claim should not be reviewed by this court. Although the defendant's claim germinates from an evidentiary ruling, the ultimate claim raised on appeal is that the prosecution deliberately violated a court order. After a review of our opinion in *Cromety*, we conclude the facts of that case to be inapposite. Although we will not afford review to unpreserved "evidentiary claims masquerading as constitutional violations"; *State* v. *Cromety*, supra, 431; those instances do not involve allegations of prosecutorial impropriety predicated on a deliberate violation of a court's evidentiary ruling.

Here, the defendant alleges that the state deliberately violated the strictures of the court's ruling, not that the court's ruling was incorrect. See *State* v. *Williams*, 102 Conn. App. 168, 176, 926 A.2d 7 ("appellate courts of this state have held that evidentiary violations of a court order should be reviewed as prosecutorial [impropriety], not evidentiary errors"), cert. denied, 284 Conn. 906, 931 A.2d 267 (2007). Therefore, we disagree with the state's contention that the defendant's claim purely is evidentiary.

At the outset, we note that a prosecutor may not deliberately ignore a court ruling. *State* v. *Ubaldi*, 190 Conn. 559, 567, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). In reviewing claims of prosecutorial impropriety, our preliminary task is to determine whether the alleged impropriety occurred. See *State* v. *Tok*, 107 Conn. App. 241, 253, 945 A.2d 558 ("[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. . . . (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial." [Internal quotation marks omitted.]), cert. denied, 287 Conn. 919, 951 A.2d 571 (2008).[12]

In the present case, the defendant claims that the state deliberately violated the court's evidentiary order. Our careful review of the court's ruling, however, does not support the contention that the prosecutor violated the court's order. We find that the court's ruling specifically allowed the state to inquire about whether the Day was contacted and whether the newspaper had published an article. The defendant miscasts the court's ruling, which expressly prohibited the prosecutor from inquiring into the content of the article but permitted the prosecutor to ask whether the Day did, in fact, publish an article. This conclusion is buttressed by the court's overruling the defendant's objection when the prosecutor asked Varone which newspaper he had contacted. After a conference among the court and counsel,

---

[12] We note, however, that a different standard is applied when the claim involves deliberate prosecutorial impropriety during trial that violates express trial rulings. "In such instances, [t]his court . . . has supervisory power to vacate a judgment of conviction and to order a new trial to deter prosecutorial [impropriety] which, while not so egregious as to deprive the defendant of a fair trial, is unduly offensive to the maintenance of a sound judicial process." (Internal quotation marks omitted.) *State* v. *Tok*, supra, 107 Conn. App. 262. Because we conclude that no prosecutorial impropriety occurred in the present case, we need not proceed with this analysis.

the court allowed Varone to testify that he contacted the Day and that the newspaper had published an article concerning the defendant. The court is well aware of the scope of its orders. Therefore, under the circumstances present here and given that there were no further objections by the defendant or intervention from the court, we cannot conclude that the prosecutor failed to comport with the court's ruling. See id., 263 (court in best position to determine whether its order had been violated); cf. *State* v. *Ubaldi*, supra, 190 Conn. 563 (court in more favorable position to assess impact of challenged remarks, given its familiarity with context in which remarks delivered). We do not agree with the defendant that the prosecutor deliberately violated the court's ruling. Accordingly, no prosecutorial impropriety occurred.

The judgment is affirmed.

In this opinion the other judges concurred.